*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CF-1340

BENITO M. VALDEZ, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2016-CF1-002267)

(Hon. Judith Bartnoff, Trial Judge)

(Argued November 9, 2021          Decided August 15, 2024)

*Daniel Gonen*, Public Defender Service, with whom *Samia Fam*, *Alice Wang*, and *Shilpa S. Satoskar*, Public Defender Service, were on the brief, for appellant.

*Daniel J. Lenerz*, Assistant United States Attorney, for appellee. *Michael R. Sherwin*, Acting United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, *Laura R. Bach*, *Lindsey M. Merikas*, and *Daniel G. Randolph*, Assistant United States Attorneys, were on the brief for appellee.

Before MᶜLEESE and SHANKER,* *Associate Judges*, and GLICKMAN,† *Senior Judge*.

GLICKMAN, *Senior Judge*: Benito M. Valdez appeals his convictions after a jury trial of three counts of kidnapping while armed, one count of sodomy while armed, and nine counts of first-degree murder while armed, consisting of three counts each of premeditated murder, felony murder (kidnapping), and felony murder (sodomy). The jury found appellant guilty based on evidence that he sexually assaulted one of the victims and then shot and killed her and her two male companions after he believed the men had tried to cheat him in a drug deal. A cooperating government witness, who admitted to having been appellant's accomplice, provided the jury with a first-hand account of the crimes. The account was corroborated by other evidence—principally, DNA evidence that linked appellant to the sexual assault, ballistics evidence, and the testimony of witnesses who reported appellant's own incriminating admissions to them.

Appellant asserts several claims of error. First, he contends his constitutional right to present a defense was violated by the trial judge's denial of a midtrial

---

* Senior Judge Ferren was originally assigned to this case. Following his retirement on April 21, 2023, Associate Judge Shanker was assigned to take his place on the division.

† Judge Glickman was an Associate Judge of the court at the time of argument. He began his service as a Senior Judge on December 21, 2022.

continuance to enable appellant to present the testimony of a hospitalized alibi witness. Second, appellant challenges several of the judge's evidentiary rulings during the trial. Third, he also contends that the judge erred by improperly undermining defense counsel's comment in closing argument on the lack of evidence corroborating certain testimony of his alleged accomplice. Fourth, appellant argues that his convictions for sodomy and felony murder predicated on sodomy must be vacated because the (now repealed) sodomy statute was unconstitutional, and also because the evidence did not support a finding, necessary for a felony murder conviction, that he committed the homicides while perpetrating the predicate felony of sodomy.[1]

We conclude that appellant's claims do not entitle him to a new trial, and we affirm his convictions.

## I.

On the night of April 22, 1991, three people—Curtis Pixley, Keith Simmons, and Samantha Gillard—were shot to death in Langdon Park in northeast

---

[1] We deem it unnecessary, as a three-judge panel of the court, to discuss appellant's final contention that his right to a public trial was violated by the use, over his objection, of a "husher" during individual voir dire of prospective jurors. Appellant has preserved the issue but, as he acknowledges, the claim is foreclosed by precedent binding on this panel. *See Blades v. United States*, 200 A.3d 230, 240-41 (D.C. 2019), *cert. denied*, 141 S. Ct. 165 (2020).

Washington, D.C. The government eventually charged appellant Benito Valdez with their murders. He was arrested and detained for those murders in February 2016. The prosecution relied heavily at appellant's trial on the testimony of Michael Green, who also was arrested for the Langdon Park murders in February 2016. By the time of appellant's trial, Green had pleaded guilty to three counts of voluntary manslaughter for his participation in those murders and to one count of second-degree murder for another, unrelated homicide (which was referred to at trial as the "Edgewood murder"). Green had agreed to plead guilty and to cooperate with the prosecution of appellant in exchange for the dismissal of the greater murder charges he faced, the government's agreement not to prosecute him for drug dealing in D.C., and the hope of leniency at his eventual sentencing.[2]

At appellant's trial, Green testified that, in April 1991, he and appellant were working for a drug dealing operation and were selling crack cocaine in Langdon Park. At that time, the two of them were the only crack sellers in the park, and they worked as a team; this was confirmed at trial by another government witness, Michael Thompson, the person in the drug operation who supplied appellant with the drugs he sold. The park was appellant's and Green's particular turf; other drug

---

[2] Because none of the counts to which Green pleaded guilty carried "while armed" enhancements, his plea did not trigger any mandatory minimum sentences of incarceration.

sellers "wouldn't come down there," Green testified, because "[t]hey knew we were armed in there."

Appellant and Green were working in Langdon Park on the night of April 22, 1991, "moving around" from place to place "[b]ecause of the police."[3]  Green was carrying a 9mm handgun, and appellant had both a 9mm handgun and a .22-caliber revolver.  They were near the tennis courts on the west side of the park when two men approached them.  The men were Curtis Pixley, whom Green knew, and Keith Simmons, whom Green had never seen before.  Addressing appellant, Pixley asked to buy "three for 50," which meant three crack rocks for $50.  Appellant produced three bags, each containing one rock of crack, and handed them to Pixley.

Green testified that Pixley "looked at it for a while and decided he didn't want it," so he purported to hand the drugs back to appellant.  Appellant examined what he received and claimed Pixley had not returned all the crack to him.  Pixley insisted he had done so, and the two men began to argue.  Appellant became upset, started cursing, and told Pixley "he better find it."  Pixley and Simmons began looking for

---

[3] Appellant's presence selling drugs in Langdon Park that particular night was confirmed by another government witness, Rodney Slayton.  Slayton testified that he was addicted to crack in 1991 and appellant was his dealer.  Slayton, who knew one of the victims of the triple murder in this case, learned of it the following morning.  He remembered buying crack from appellant in Langdon Park the previous night, and hearing several gunshots from the park after he left.

the missing crack on the ground, and appellant and Green pulled their guns out. Pixley pulled his pockets inside out to show that he did not have the supposedly missing crack in them. In doing so, Pixley revealed to Green and appellant that he also did not have any money with which he could have paid for the crack he supposedly had come to buy.

At some point in this standoff, a woman whom Green did not know came up to them. This was Samantha Gillard, a friend of Pixley's. Pixley told her to go back to the car, but according to Green, appellant said "no, she's going to have to do something for the drugs that are missing." Pixley told Gillard to "go ahead and do it" so that they could leave. While Green stayed with Pixley and Simmons and stood guard over them, appellant walked Gillard, who had begun crying, to a spot by the tennis courts. Green saw appellant force Gillard, at gunpoint, to perform oral sex and what Green described as "sex from behind."

Appellant then returned with Gillard, who was still crying, and asked Green whether he wanted to have sex with her; Green testified that he declined. Green testified that he expected the three individuals now would be free to go, but appellant ordered Gillard to get down on the ground with Pixley and Simmons. They obeyed, lying face down next to each other. Ignoring their pleas to be allowed to leave, appellant then shot all three of them, first with the 9mm handgun, then with the .22-

caliber revolver. Green testified at trial that he just stood there and did not fire any of the shots. Appellant and Green then ran to appellant's car, which was parked on the east end of Langdon Park, and drove away.[4]

The bodies of the three murdered persons were discovered the morning after they were shot. Each victim had received multiple gunshot wounds. The ballistics evidence recovered by police from their bodies and at the scene consisted of thirteen 9mm bullet casings, nine 9mm bullets, and four .22-caliber bullets. A firearm and tool-mark identification expert opined that all the 9mm bullets and casings were fired by the same firearm, and that the same was true of all the .22-caliber bullets.[5] The absence of any .22-caliber casings indicated that the bullets were fired by a revolver.

Semen was found on the left lower arm and the right upper arm of Gillard's jacket, and on the front right thigh and back left knee of Gillard's jeans. Appellant's

---

[4] Green also testified that appellant later told him he had arranged for someone known as "Tricky Rick" to provide an alibi for them both in exchange for drugs. As we discuss below, appellant intended to call this person to testify as a defense witness at trial, but was unable to do so because the witness was hospitalized. By agreement of the parties, the court instructed the jury that Green's testimony regarding Tricky Rick was stricken and that the jury should not consider it.

[5] The trial court admitted this opinion testimony over defense objection, having concluded after briefing and a hearing that the testimony satisfied the requirements of *Gardner v. United States*, 140 A.3d 1172 (D.C. 2016). Appellant has not contended on appeal that the court erred in doing so.

DNA matched the DNA that later was recovered from semen on the lower left arm, front right thigh, and back left knee, and it was excluded as a contributor to the semen on the right upper arm. Green was excluded as a contributor to any of the semen found on Gillard's clothing (as were a number of other potential sources, including Pixley and Simmons). Green testified that in his first debriefing by the government, which occurred in August 2016, he predicted that the then-pending DNA analysis of Gillard's clothes would show the presence of appellant's DNA. Green also testified that appellant had told him (prior to his first debriefing) that he would explain any such finding by saying he had been "trick[ing]" Gillard, meaning he had given her drugs in exchange for sex on an earlier occasion. Green denied that appellant told him he actually had been "tricking" Gillard.[6]

Four witnesses testified at trial that appellant had made admissions about the Langdon Park killing directly to them or to other persons in their presence. Three of these witnesses were called by the government. One of them was Samuel Edmonds. He met appellant in 2001 and sold drugs with him before they both were charged in 2003 in federal district court with conspiring to distribute cocaine. Edmonds pleaded guilty in that case, agreed to cooperate with the government, and

---

[6] Appellant suggests that the presence of unidentified semen on Gillard's clothing lends support to the hypothesis that the semen containing his DNA was similarly attributable to a prior, consensual sexual encounter with her. There was no evidence at trial supporting this hypothesis, however.

testified before a grand jury in 2005 about appellant's admissions to the homicides, among other matters. Edmonds recapitulated that testimony at appellant's trial. He testified that, in a conversation in 2001 regarding money they were owed for drugs, appellant declared, "Well, these motherfuckers will get killed. I already did it once, three times as a matter of fact at one time. So I'll do it again." Edmonds testified that, in subsequent conversations around the same time, appellant said he committed the killings in Langdon Park. (He also acknowledged prior grand jury testimony in which he stated that he thought appellant had said the victims were "two males and one female," but Edmonds could not remember as of trial whether appellant or someone else had said that.) Edmonds said appellant told him the killings were over some missing drugs: appellant "couldn't find them," he questioned the three victims about it but "no one confessed" to having taken the drugs, "[s]o he shot them." Appellant also told Edmonds that someone named "Mike" was with him during the shooting but "was just standing there." Appellant did not tell Edmonds that Mike shot anybody.[7]

---

[7] Edmonds also recalled that appellant said a third person, identified as "Black Harry," was waiting for him in a car. Appellant did not say Black Harry had anything to do with the shooting.

Another government witness who testified about appellant's admissions was Odrianne Beckwith.[8]  Around 2001, she and appellant began dating, and he moved in with her in January 2002.  In the spring of 2002, Beckwith testified, appellant, in a "fit [of] rage," accused her of cheating on him with another man he saw downstairs in her house (who, as she explained to him, was merely her nephew paying a visit).  Beckwith testified that appellant said "I killed three people," and "for me to just kill you and everybody downstairs is nothing."  According to Beckwith, appellant again mentioned his commission of this triple murder "when he would go in his fits about six or seven times maybe."  She recalled that he told her he had "killed these three people over drugs," that the victims were "short [of] money," and "he told them to lay [sic] down on the ground and then he shot the three people."  Appellant also "mentioned [to Beckwith] that some guy named Mike . . . was there and another gentleman named Black Harry."  But appellant said he was the shooter, and he never said what Mike or Black Harry did.[9]

---

[8] Beckwith also had testified before the grand jury in 2005.  Because she had suffered severe memory impairment and loss due to injuries she sustained in a serious car accident in 2009, her relevant testimony was mainly what she provided in her 2005 grand jury appearance.

[9] As we discuss *infra*, Beckwith testified on cross-examination that she ended her relationship with appellant in July 2002, when she went to the police and reported his abuse of her, his possession of guns and drugs in the home, and his ongoing drug

The government's third witness who reported a confession by appellant was Neeka Sullivan ("Neeka"[10]), who looked after Beckwith's children in 2002. In that connection, Neeka said she got to know appellant and that he called her his "godmother." Neeka testified that one day in 2002, appellant came over to her house, sat down next to her, put his head on her shoulder, and started "rambling off." As they chatted, Neeka testified,

> [H]e stated that, do you remember what happened down on Langdon Park? . . . And I—I said, I know you ain't talking about the three people down there, and he said yeah. And I said, Benito; and he says, I did it. I said, Benito, why is you telling me something like this? You know. And I was, like, I don't know whether to say I was in a state of shock or just paranoid or I didn't know what to say. . . . I asked him why would he do something like that, and the only thing he said was a rock. And I said a rock? He said, yeah, a rock.

Neeka understood appellant to mean a rock of crack cocaine.

The fourth witness who reported incriminating admissions by appellant was Neeka Sullivan's son, Harry Sullivan. He had pleaded guilty in the 2003 federal court case to having conspired with appellant and Edmonds to distribute drugs, and he had agreed to cooperate with the government. The government did not call Harry

---

activity. She first reported appellant's statements to her about having killed three people in 2005.

[10] We refer to her as "Neeka" to avoid confusion with her son, Harry Sullivan, a witness whom the defense called, as we discuss below.

Sullivan as a witness at appellant's trial, however. But the defense called him as part of its effort to rebut the testimony of Edmonds, Beckwith, and Neeka by suggesting that Sullivan had colluded with them to fabricate and report admissions of guilt by appellant. In his direct examination, appellant's counsel elicited Sullivan's claim (which he did not disavow) that appellant had "confessed" the triple homicide to him, but Sullivan denied having colluded with the other witnesses who reported appellant's confessions to the murders. Sullivan testified that, in 2002, appellant began siphoning off some of the cocaine they were selling for his own use. Appellant told Sullivan he needed the drugs in order to relax and sleep at night, because he was "so bothered by what he had done in the park." Appellant confessed to Sullivan that "he laid the three people down and shot them in the park" "because they violated and had to pay." Sullivan also confirmed that Neeka later told him that appellant had confessed the killings to her as well ("[S]he was, like, I need to talk to you. . . . [T]hat boy is going crazy. He talking about he kilt [sic] some people back in the park.").

## II.

### A. Denial of a Midtrial Continuance

Appellant contends that the trial court abused its discretion and violated his constitutional rights when it denied his request for a midtrial continuance that might

have enabled him to present the testimony of a purported alibi witness who had just been hospitalized after suffering an incapacitating stroke. The government argues that the court did not err, mainly because it was unlikely the witness would have been able and willing to testify within a reasonable period of time (if at all), and because the witness's proffered testimony would not have been exculpatory, but rather would have corroborated Michael Green's account of appellant's involvement in the shootings. For the following reasons, we agree that the court did not err in denying appellant's request for a midtrial continuance.

## 1. Background

The proposed alibi witness was a person named Ricky Staton, a drug user who frequented Langdon Park in 1991 and went by the nickname "Tricky Rick." Michael Green testified that, shortly after the murders, appellant told him he was going to have Tricky Rick "put us at a different location at the time of the murder." Green testified that when he and appellant were arrested in 2016, appellant assured him that "he still had the alibi with Tricky Rick."

The police questioned Staton about the Langdon Park murders in March 2016. He told the police he "knew nothing about the murders other than what he heard the next day." Staton said that "he was a DJ for [a group called] Rare Essence" in 1991;

that "he was at the club the night of the murders and he was nowhere near Langdon Park at the time of the murders."

However, Staton told a defense investigator something else. At appellant's April 2016 preliminary hearing, the investigator testified that Staton said he was in Langdon Park in 1991 and saw appellant near the swimming pool on the east side of the park shortly after hearing gunshots coming from the west side of the park. This was the essence of the testimony that appellant's defense counsel planned to offer at trial. Appellant and his counsel were aware of Staton's contrary statements to the police. But as the investigator testified at the preliminary hearing and defense counsel later represented to the trial court, Staton had explained that he lied to the police because "he felt this was information for Mr. Valdez's lawyer," and that if he provided an alibi for appellant to the police they would "press him" to retract it.

So the defense proposed to call Staton as a witness at trial and apparently was going to do so on February 7, 2018. His testimony was deferred, however, because the government identified a Fifth Amendment privilege issue arising from the possibility that Staton would incriminate himself (apparently by admitting in his testimony that he had made false statements to the police). The court appointed counsel to represent and advise Staton. The next day, Thursday, February 8, the court was informed that Staton's counsel, Mr. Healey, agreed there might be a Fifth

Amendment issue and sought a *Carter* debriefing of Staton by the government.[11]

The implication of this proposal was that Staton likely would assert his privilege against self-incrimination and not testify for the defense if he did not receive use immunity for his testimony. The government was willing to do the debriefing, and the prosecutor told the court she expected that the matter could be "resolved first thing Monday morning" (when the trial was scheduled to resume after a three-day recess). The court approved this approach. If the government agreed to grant use immunity, defense counsel anticipated that Staton would testify on Monday, February 12, and that the defense would rest its case that day.

Over the weekend, however, before the government could debrief him, Staton was hospitalized. Mr. Healey reported to the court on Monday that Staton had

---

[11] In *Carter v. United States*, 684 A.2d 331 (D.C. 1996) (en banc), the court endorsed a debriefing procedure that may be followed when a potential defense witness invokes the privilege against self-incrimination and refuses to testify. If the defendant establishes to the trial court's satisfaction that the proposed testimony is material, (clearly) exculpatory, non-cumulative, and otherwise unobtainable, the prosecution may debrief the witness to determine whether the government "will accede to a grant of use immunity to the witness" and thereby enable the defendant to obtain the witness's testimony. *Id.* at 344-45. We later clarified in *Young v. United States*, 143 A.3d 751 (D.C. 2016), that "exculpatory" or "clearly exculpatory" evidence means the same the thing in *Carter* as it means in the context of applying *Brady v Maryland*, 373 U.S. 83 (1963), i.e., "evidence that 'tends substantively to negate guilt.'" *Young*, 143 A.3d at 756 (quoting *Love v. Johnson*, 57 F.3d 1305, 1313 (4th Cir. 1995)). Likewise, as in the *Brady* context, a witness's exculpatory testimony is only "material" if it "would . . . give rise to a reasonable probability of a different outcome" in the trial. *Id.* at 759.

suffered a stroke, had intracranial bleeding, and was being treated in the intensive care unit. Although his condition had improved over the weekend so that emergency surgery was not required, Healey said Staton was likely to remain in the ICU for up to a week, and then to spend a week or two more in the hospital followed by several weeks in a rehabilitation facility. Mr. Healey emphasized that the extent and permanence of the damage to Staton's cognitive functioning was not yet known and that he would be unable to provide testimony for an indefinite period of time; "the pressure of testifying," Healey said, "is radically out."

Defense counsel, noting the prospect for Staton's further improvement, requested a "brief" continuance to see whether Staton would improve and be able to testify. In support of that request, defense counsel proffered that Staton would testify he was in Langdon Park when he heard gunshots on the west side of the park, and that he then "ran towards the pool area [on the east side of the park] and saw Mr. Valdez by the pool in Langdon Park." The court later was informed that the defense also expected Staton to testify that appellant was with Michael Green at the time. It was unclear from the defense proffer how Staton linked his recollection to the particular night in 1991 on which the three murders in Langdon Park were committed, but that linkage may be explained by the fact (proffered by the

government, not the defense) that Staton told the police he learned of those murders the next day.[12]

The government opposed the request for a continuance. The prosecutor argued that the defense proffer was contrary to what Staton had told the police (i.e., that he was at work and not in Langdon Park the night of the murders); that the proffered testimony would not be exculpatory (and "[d]efinitely not clearly exculpatory") because it was consistent with Green's testimony that he and appellant ran to the east side of the park after the shooting; and that it was doubtful the government would give Staton the use immunity he sought in order to testify, even if he recovered to the point where he could be debriefed, in view of the government's concerns about his credibility and his competence to testify.

Summing things up, the judge stated that from what she had heard up to that point, she had "no idea" how long Staton would be in intensive care or when if ever

---

[12] The court asked defense counsel whether Staton would "testify to the date of that." Counsel responded that she did not know if Staton knew the actual date, but what he recounted was "in the context of . . . the triple homicide which everybody knew about." This response left unsettled the issue of whether Staton would be able to link the event he recalled to the night of the triple homicide. Defense counsel did not proffer how Staton was able to make that connection; counsel did not suggest that it was because Staton heard the very next day or shortly thereafter that the bodies of the three murder victims had been discovered that morning in Langdon Park. The prosecutor, however, reported that Staton told the police he learned of the Langdon Park homicides the next morning (when he also told the police he had not been in Langdon Park the night of the murders).

he would be "physically and medically able to testify"; in light of Staton's conflicting statements, she also did not know what to expect his testimony would be if he were called as a witness and placed under oath; and that it was "not at all clear" Staton's testimony, even as proffered by the defense, would be exculpatory for appellant. Under those circumstances, the judge declared she was "not prepared" to grant what "would be essentially an indefinite continuance at the beginning of the fourth week of this trial." Appellant's counsel responded that the defense was not asking for an indefinite continuance, but only "a continuance of two to three days to see if [Staton's] condition improves."

The judge agreed to hear from Staton's treating physician about his prognosis before ruling on the continuance request. The following day, Dr. Francisco Hoyos testified under oath in a phone call with the court. Dr. Hoyos confirmed that Staton was suffering from intracerebral bleeding with "active inflammation in [his] brain" and was on medication, including morphine. Staton, who was sixty-three years old, would sometimes become "totally confused," and his memory, abstract reasoning skills, and his "capacity to understand . . . the consequences of" his statements all were impaired. Dr. Hoyos explained that Staton's "brain [was] still swollen" and opined that Staton was not "medically" ready to testify, because such activity would likely elevate his blood pressure and worsen his precarious condition. Dr. Hoyos stated that "medically we would not like him to go through that stress." Dr. Hoyos

also described the medications Staton was receiving, which included antiseizure and sedative drugs because he had been having seizures when he arrived at the hospital.

Dr. Hoyos testified that it was "hard to predict the timeframe" for Staton's recovery. He would need a period of rehabilitation even after his stay in the hospital. Dr. Hoyos considered it possible Staton might "improve significantly after 48 hours," but even so he believed that Staton would need "three to four weeks" before he could safely participate in the trial proceedings, and that Staton "[d]efinitely" would be unable to testify in court "in the next ten days." And Dr. Hoyos likewise recommended against trying in the next ten days to obtain Staton's testimony remotely from the hospital (i.e., from his hospital bed). Dr. Hoyos noted that the doctors were still running tests "to make sure there's no worsening of [Staton's] brain condition . . . [due to] the brain inflammation [that] is still there." Dr. Hoyos said Staton's "neurologic findings . . . are telling us that still the brain inflammation is very active."

Following this testimony, defense counsel again asked for "a continuance of two days to see where we are in two days." The government opposed that request. Crediting Dr. Hoyos's testimony, the court denied the request.[13] The judge

---

[13] The defense argued that Dr. Hoyos had said "this was a day by day thing and he may surprise us and he could improve within the next 48 hours." The court

concluded that Staton "has become incapacitated and we don't have any reason to believe he will regain capacity to testify in a reasonable time." The judge explained that "it makes no sense . . . to recess the trial for two days" when Staton "certainly currently [was] not able to testify" and would need at least "the next ten days" and likely more time than that to recover and be able to testify. It likewise was "not at all clear" that Staton would regain the capacity in a reasonable amount of time to engage in the debriefing/immunity procedure with the government (or to validly waive his Fifth Amendment privilege) which was a necessary prerequisite to his testimony.[14] "[W]hat you don't want to do," the judge emphasized, "is to put a patient with an int[ra]cranial bleed in a position that would increase his blood pressure and do other things that would endanger his life." Moreover, the judge noted, the trial was in its fourth week (it would conclude with jury instructions and closing arguments that same day) and the jury had been told the trial would last three to four weeks.

---

responded that this was not "how I heard it, actually" and indicated "what's notable is that he came into the hospital on Friday and left on Saturday and came back on Saturday. It's now Tuesday. So, we're well beyond 48 hours . . . ."

[14] Practically speaking, the judge observed, "[w]e're talking about at least two weeks if we're talking about ten days and even at that point, we have no reason to believe that [Staton] actually would be able to [testify]."

Because the defense was unable to present Staton's proffered testimony, the parties and the court agreed to strike Michael Green's testimony regarding the enlistment of Tricky Rick to provide a false alibi, and the court instructed the jury to disregard that testimony.

## 2. Discussion

Appellant contends the trial court's reasons for denying a continuance to obtain Staton's testimony were mistaken and insufficient, and that the ruling denied him a fair trial by preventing him from presenting his alibi defense. The government argues that the court did not err, principally because Staton's proffered testimony was not exculpatory and the requested continuance would have been futile. We review a trial judge's denial of a request for a midtrial continuance to secure a witness for abuse of discretion.[15] We conclude that the trial court did not abuse its discretion here.

---

[15] *Jones v. United States*, 127 A.3d 1173, 1189 (D.C. 2015); *see also, e.g.*, *Dorsey v. United States*, 154 A.3d 106, 120 (D.C. 2017) ("[T]he grant or denial of a continuance rests within the sound discretion of the trial judge, to whom we accord wide latitude." (quoting *Moctar v. United States*, 718 A.2d 1063, 1065 (D.C. 1998))).

Our cases have identified several relevant "[f]actors to be considered" in determining whether a trial court abused its discretion in denying a midtrial continuance to secure a witness.[16]  These include:

> [1] the probative value of the absent witness's proffered testimony, [2] the likelihood the witness would have appeared had the continuance been granted, [3] the diligence and good faith of the party seeking the continuance, [4] the prejudice [to that party] resulting from the denial of the continuance, [5] any prejudice the opposing party would have suffered had the continuance been granted, and [6] the duration of the requested continuance and any likely resulting disruption or delay of the trial.[17]

Thus, a defendant seeking a midtrial continuance to obtain the testimony of an absent witness must show what that testimony would be and that it "could *probably* be obtained if the continuance were granted."[18]  In weighing the defendant's need for the witness, "[t]he trial court also may properly consider the public's interest in the

---

[16] *Jones*, 127 A.3d at 1189.

[17] *Id*. (citing *Gilliam v. United States*, 80 A.3d 192, 202 (D.C. 2013)).

[18] *Id*. (emphasis added); *see also, e.g.*, *Moctar*, 718 A.2d at 1065-66.  The parties dispute whether this is a "more likely than not" standard or something less than that (e.g., a "reasonable possibility"), a question we need not resolve because, as explained, there was very little likelihood of the witness's availability to testify within two or three days.

'prompt, effective, and efficient administration of justice.'"[19]  However, "[w]hile efficiency in the conduct of the trial is a laudable goal, it must yield when a party has demonstrated that a requested continuance is 'reasonably necessary for a just determination of the cause.'"[20]

---

[19] *Dorsey*, 154 A.3d at 121 (quoting *Brooks v. United States*, 130 A.3d 952, 960 (D.C. 2016)).  We note that past cases of this court sometimes have mentioned other relevant considerations or expressed them in varying but essentially equivalent or overlapping terms.  *See, e.g.*, *Brooks*, 130 A.3d at 960 (listing "the reasons for the request for a continuance" and "any lack of good faith" as among the relevant factors (quoting *Daley v. United States*, 739 A.2d 814, 817 (D.C. 1999))); *Bedney v. United States*, 684 A.2d 759, 766 (D.C. 1996) (stating that the movant for a continuance to secure a missing witness "must establish (1) who the missing witness is, (2) what the witness' testimony would be, (3) the relevance and competence of that testimony, (4) that the witness could probably be obtained if the continuance were granted, and (5) that the party seeking the continuance has exercised due diligence in trying to locate the witness").  For present purposes, we think it unnecessary to sort out the divergent ways our cases have formulated the factors bearing on whether a continuance must be granted in the interest of justice to obtain the testimony of a missing witness.  We consider the other formulations to be subsumed within the factors listed in the above text.

There also may be a question raised by the language of our past cases concerning the extent to which certain minimum prerequisites must be satisfied before the judge may exercise discretion to grant a midtrial continuance for a missing witness.  Certainly it would seem that the party seeking such an interruption in the trial ordinarily should proffer what testimony the absent witness is expected to provide, and some reason to believe the witness might be available, for the judge to render an informed discretionary judgment granting a continuance.  That said, given our resolution of the continuance issue in this case, we need not grapple further with the question and we refrain from doing so.

[20] *Gilliam*, 80 A.3d at 202 (quoting *O'Connor v. United States*, 399 A.2d 21, 28 (D.C. 1979)); *see also Martin v. United States*, 606 A.2d 120, 131-32 (D.C. 1991) (holding that trial court abused its discretion in denying a mistrial that was necessary

In our view, the paramount considerations in this appeal are the probative value of the proffered testimony of Staton, the probability that his testimony would have been received had the court granted the request for a continuance, and (to a somewhat lesser extent) whether granting a continuance would have unduly delayed and disrupted the trial proceedings.  We discuss each of these three considerations in turn.[21]

### a. The Proffered Testimony and Its Probative Value

Appellant proffered minimal information about what Staton was expected to say if he testified.  The court was told only that Staton would say he was in Langdon Park, heard gunshots on the west side of the park, ran toward the pool area on the east side of the park, and saw appellant and Green there.  Without more, and even

---

to enable defendant to call an available witness whose testimony, if it were credited by the jury, would have been exculpatory).

[21] We view the other relevant factors mentioned above as being of less significance here.  First, the government does not dispute, and we do not question, defense counsel's diligence and good faith in seeking the midtrial continuance in order to call Staton as a witness.  Second, whether appellant was prejudiced by the denial of the continuance turns, in this case, on the probative value of Staton's proffered testimony or lack thereof, and on the probability that Staton's testimony would have been received had the continuance been granted.  Third, setting aside the adverse consequences of delay and disruption of the trial, any prejudice to the government's legitimate interests from granting the continuance would have been minimal, for the government already had completed its case-in-chief, it had expected Staton to be a defense witness, and it would not have been surprised or otherwise disadvantaged by the late receipt of his testimony in the defense case.

assuming Staton would say this occurred on the night when the murders were committed, his proffered testimony did not establish an alibi for appellant and was not exculpatory. On the contrary, the proffered testimony tended to inculpate appellant in the crimes. Not only did it put appellant in Langdon Park close in time to the shootings there, it put him there *with Green* (who admitted having participated in the homicides), and it corroborated Green's testimony that he and appellant themselves ran to the east side of the park immediately after the shootings.[22] For these reasons alone, Staton's proffered testimony, even if credited in full by a jury,

---

[22] On appeal, appellant claims Staton also would have testified that he saw appellant in the area of the swimming pool less than a minute after he heard the gunshots. The only record basis for this claim is the testimony of the defense investigator at appellant's preliminary hearing in 2016. The investigator, who had interviewed Staton but had not taken a written statement from him, initially testified that Staton had not told him how much time passed between when he heard the shots and when he saw appellant. Later that day, after a break, the defense recalled the investigator to the witness stand. The investigator then testified that he had spoken again with Staton during the break, and that Staton said "[u]nder one minute" passed between the time he heard the gunshots and the time he saw appellant.

Appellant argues that such testimony at trial by Staton himself would have been exculpatory because, if his time estimate was accurate, it would have placed appellant "the equivalent of five or six city blocks away" from the location of the shooting less than a minute later. But the defense made no mention of such testimony by Staton in its proffer of his anticipated testimony to the trial judge (who was not the judge who presided at appellant's preliminary hearing). It is too late now to try to expand that proffer. The trial court cannot be faulted for failing to consider information not given to it. *Cf. Moctar*, 718 A.2d at 1066 n.5 (rejecting argument that a sufficient proffer was not necessary where the witness sought had testified at a prior suppression hearing but that hearing was "held before a different judge").

had little probative value for appellant and likely would have been, on balance, more prejudicial to the defense than exculpatory.[23]

To put it differently, appellant did not proffer enough to show that the continuance he requested was reasonably necessary to a just determination of his guilt or innocence. If this were a case in which the proffered testimony would have been exculpatory if believed, that fact would weigh heavily in favor of granting a reasonable continuance. But this is not such a case.

---

[23] In addition, of course, the proffered testimony, if given at trial, would have been impeached by Staton's statements to the police denying he had been in Langdon Park when the murders were committed. Staton's foreseeable claim that he lied to the police about such an important matter "would surely have lessened the jurors' trust" in his exculpatory testimony on appellant's behalf. *Bennett v. United States*, 797 A.2d 1251, 1257 (D.C. 2002). And even without that impeachment, the jury would have had many reasons to disbelieve Staton's testimony. This court has said, however, that in determining whether to grant a motion to sever (or, by analogy, a continuance) sought by a defendant to secure a potential witness's testimony, "[a] trial court should not rely upon credibility determinations of . . . proposed testimony when assessing whether the testimony is substantially exculpatory as credibility determinations are reserved for the jury." *Rollerson v. United States*, 127 A.3d 1220, 1227 (D.C. 2015); *see also, e.g., Daley v. United States*, 739 A.2d 814, 818 (D.C. 1999) ("Although the government argues that it presented significant opposing evidence and that [the witness's] testimony could be discredited and would not have affected the outcome of the trial, we cannot say that his testimony would not have aided [appellant's] case. That testimony therefore was reasonably necessary to enable [appellant] to present his case."); *Martin*, 606 A.2d at 129 (holding that where the absent witness's proffered testimony would be exculpatory if credited, "the question of [the witness's] credibility [is] for the jury, not the judge"). Accordingly, we do not attempt to base our decision in this appeal on any judgment as to Staton's likely credibility or the persuasiveness of his account.

### b. Staton's Availability to Testify

Appellant requested a midtrial continuance of two to three days. Dr. Hoyos's testimony describing Staton's medical condition and prognosis amply supported the trial court's finding that there was no reasonable likelihood Staton would have been able to testify in such a short period of time (or even within a longer period on the order of ten days or two weeks) without serious jeopardy to his health.[24] The court was sufficiently clear on this point that we are not persuaded by appellant's objection that the court erroneously based its decision on a mistaken concern about Staton's lack of legal competency to testify rather than the danger to his wellbeing. We are also not persuaded that the court based its decision on a clearly erroneous understanding of Dr. Hoyos's statement that Staton might improve significantly within forty-eight hours. It is true that when defense counsel accurately summarized this testimony, the court claimed to have "heard it" differently and then commented on the lack of improvement in the *preceding* forty-eight hours. *See* note 13, *supra*. It is not entirely clear to us what exactly the court disagreed with about defense

---

[24] On appeal, appellant faults the trial court for not granting a midtrial continuance of ten days or so. But appellant specifically and repeatedly requested only a two or three day continuance. Even after hearing Dr. Hoyos's prognosis, appellant did not ask for a longer continuance. We consider appellant to have forfeited any claim that the court should have granted a longer continuance, and we certainly cannot find plain error in the court's failure to do so.

counsel's characterization of that testimony. But, at base, we perceive no error, much less clear error, in the court's conclusion that the overall import of Dr. Hoyos's testimony was that Staton would not have been able to testify safely, either remotely or in court, for at least the next ten days. At no point did Dr. Hoyos testify that forty-eight hours might have made a dispositive difference—the possibility of significant improvement notwithstanding.

Moreover, the record raises a substantial question as to whether Staton would have testified even if the court had granted a continuance of sufficient duration to enable him to recover from his stroke. Staton and his counsel were seeking a grant of use immunity in exchange for his testimony. This eventually would have required Staton to be debriefed by the United States Attorney's Office and to satisfy the government that his proffered testimony would have been substantively exculpatory.[25] It is doubtful that Staton could have met that requirement; as we have noted, the prosecutor viewed his proffered testimony as not exculpatory at all. In addition, his proffered testimony would have had to satisfy the additional *Carter* requirement that it be "material," i.e., that it would "give rise to a reasonable

---

[25] *See Carter*, 684 A.2d at 345; *Young*, 143 A.3d at 756.

probability of a different outcome."[26]  For essentially the same reasons, this too is highly doubtful.

Finally, even if the testimony met the above requirements, the United States Attorney's Office could have declined to grant use immunity if it had a "reasonable basis" for doing so, including, for example, "clear indications of potential perjury."[27] In light of Green's testimony that appellant had arranged for Staton to furnish them a false alibi, and Staton's statements to the police denying he had been in Langdon Park on the night of the murders, we suppose it likely that the government reasonably would have evaluated Staton's proposed testimony as probably perjurious and thus refused to grant him immunity for it.  On the record before us, we have no reason to think that without a grant of immunity, Staton, represented by counsel, would have waived his privilege against self-incrimination and gone ahead with his testimony. Moreover, there is a further question on this record whether Staton, in his medically

---

[26] *Young*, 143 A.3d at 759.

[27] *Carter*, 684 A.2d at 342; *see also, e.g.*, *Hayes v. United States*, 109 A.3d 1110, 1112, 1116-18 (D.C. 2015) (affirming the trial court's finding that the prosecution did not abuse its discretion when it declined to grant use immunity to a witness "after finding potential for perjury during a debriefing procedure pursuant to *Carter*").

compromised state, could have made a knowing and voluntary waiver of his Fifth Amendment rights even had he been inclined to do so.[28]

For these reasons, we conclude that appellant has not carried his burden of showing that Staton's testimony "probably" could have been obtained in two or three days or any reasonable period of time if the trial court had granted a continuance.

### c. Delay and Disruption of the Trial

The record supports the trial court's finding that a continuance of at least two weeks would have been necessary to have any realistic hope of securing Staton's availability to testify. For that reason, and the reasons explained above, the trial court did not abuse its discretion in denying a shorter two or three day continuance.

Insofar as a weeks-long delay might have secured Staton's testimony, such delay would have substantially disrupted the trial. The trial then was in its fourth week and, since neither side had other witnesses to present, the case was otherwise ready to go to the jury. The continuance therefore would have meant a hiatus of at least two weeks until the unpredictable day on which the trial could be resumed with

---

[28] We likewise have no reason to think that the court would "sanction" the government for its refusal to immunize Staton in order to obtain his testimony. *See Carter*, 684 A.2d at 344; *Hayes*, 109 A.3d at 1116 (explaining when the trial court may impose a sanction under *Carter*).

Staton's testimony. This would have inconvenienced all the trial participants, and especially the members of the jury, who had been told the trial would last only three or four weeks. They would have been obliged to remain on call well beyond that time and to put other plans on hold. The disruption might well have resulted in the loss of some of those jurors. Perhaps most importantly, the lengthy hiatus and prolongation of the trial would likely have had a deleterious effect on the jury's eventual deliberations—not merely because the jurors' patience would have been strained, but also because their memories of the testimony would have suffered from the passage of time and the delay in discussing the evidence, and because their views of the case might well have hardened in the interim.

The key considerations we have identified and discussed point in only one direction—that the trial court did not abuse its discretion in denying appellant's continuance request. We so hold.

## B. Evidence of Past Acts of Violence or Intimidation

Appellant contends the trial court erred in admitting limited testimony about his past use of violence and intimidation to establish and maintain his control over the sale of drugs in Langdon Park. The brief testimony at issue concerned (1) an incident in which members of a rival drug crew shot at appellant in Langdon Park and he fired back at them and (2) appellant's pattern of aggressive behavior toward

drug buyers to deter them from purchasing from rival sellers or attempting to cheat him.  Appellant also asserts that the court erred when it ruled that defense counsel's questioning of Odrianne Beckwith and Harry Sullivan "opened the door" to limited testimony from them about appellant's prior domestic violence in his relationship with Beckwith.  Appellant argues that the foregoing testimony contravened the basic rule that "evidence of prior bad acts independent of the crimes charged is inadmissible to show the defendant's disposition or propensity to commit the charged offenses, from which the jury improperly could infer the defendant actually did commit them."[29]

The government argues that appellant's prior acts of violence and intimidation at Langdon Park described in the testimony in question were admissible under *Drew v. United States* for the "substantial, legitimate purpose[s]" of proving appellant's motive to commit the murders and his identity as the perpetrator,[30] and also under *Johnson v. United States* as being "necessary to place the charged crime in an understandable context."[31]    And the government argues that appellant's examinations of Beckwith and Sullivan did indeed "open the door" to testimony

---

[29] *Harrison v. United States*, 30 A.3d 169, 176 (D.C. 2011); *see also Johnson v. United States*, 683 A.2d 1087, 1101 (D.C. 1996) (en banc).

[30] 331 F.2d 85, 90 (D.C. Cir. 1964).

[31] 683 A.2d at 1098.

about domestic violence for the purpose of refuting impressions invited by the defense questioning.

"We review the trial court's decision to admit evidence, including evidence of other crimes, for an abuse of discretion."[32]  For the following reasons, we conclude that the trial court did not abuse its discretion by admitting the limited testimony that appellant challenges.

## 1. Testimony Concerning Appellant's Control of Langdon Park and His Treatment of Drug Buyers

In advance of trial, the government moved in limine for permission to present evidence that appellant's crew controlled the drug trade in Langdon Park through violence and intimidation, including evidence that "when other individuals perceived to be a threat or rival came into Langdon Park, they were fired upon by the defendant(s)" (and thus were kept out of appellant's sales territory).  The government argued that this evidence would show there were no other drug dealers in the park who might have committed the murders, and would help explain to the jury why appellant would go so far as to murder three people in a seemingly trivial dispute "over a $10 rock of crack."  Thus, the government argued, the evidence would be admissible under *Drew* as proof of appellant's identity as the perpetrator

---

[32] *Jones v. United States*, 27 A.3d 1130, 1143 (D.C. 2011).

and his motive to kill the victims, and under *Johnson* as evidence placing the crime in an understandable context.  Essentially accepting the government's argument, the trial court ruled the proffered "control of the park" evidence admissible under *Drew* and *Johnson*, with the caveat (sought by the defense and accepted by the government) that this would not be a "blank check" for the government to present evidence of other drug-related crimes that it had not described and that were not linked to the rationale approved by the court.

The government introduced testimony from several witnesses to establish that, by April 1991, appellant's crew had monopolized the selling of crack cocaine in Langdon Park, and that appellant and Green were the only drug dealers operating there.  One of those witnesses was Michael Thompson, the crew member who supplied appellant and Michael Green with the drugs they purveyed in the park.

When he was asked on direct examination how other drug dealers were kept out of the park, Thompson attributed it to the crew's "reputation"—by implication, its violent reputation.  Thompson testified that "everybody," including appellant, Michael Green, and Thompson himself, carried guns while selling drugs in the park.  The prosecutor then inquired about the incident mentioned in the government's motion in limine of a clash with rival drug sellers.  According to Thompson, it involved some individuals who sold drugs on Montana Avenue, not far from

Langdon Park. Thompson stated that the relationship between these individuals and his dealers in Langdon Park "wasn't good," that members of the Montana Avenue group "were always com[ing] past the park in . . . a truck," and that "one time they actually fired into . . . the park while we were down there." On that occasion, Thompson testified, he ran while appellant "went after them, shooting up the hill," and the attackers departed.

The prosecutor also asked Thompson if he could describe how appellant "interacted with . . . drug addicts." Thompson said appellant was "a little aggressive with his sales" and "would sometimes bully" them "to buy from him as opposed to . . . someone else." When asked whether he had ever seen appellant "put his hands on any drug addicts," Thompson answered, "Like, roughing up, yeah." Thompson acknowledged having described appellant as a "loose cannon" in the sense that "[s]mall things"—like not "get[ting] a sale" or "somebody . . . try[ing] to take something from him"—"could tick him off."[33] Defense counsel did not object to the relevance or admissibility of this brief testimony when it was elicited; instead,

---

[33] Thompson testified that drug addicts had "tricks" they would pull to try to "scam drugs" from dealers: "Sometimes they would say, Let me see the product. Maybe grab it and run. Sometimes they would take a look at it and maybe pinch some off, open the bag, pinch some off, close it before you can notice that they took something out of the package."

counsel cross-examined Thompson about it.[34]  In response to questions about appellant's "aggressive" conduct toward drug buyers, Thompson agreed with defense counsel's statements that appellant would "get mad if someone tried to cheat him" and "had no problems confronting a cheating buyer and straightening him out with his bare hands."  Thompson did not testify that appellant ever confronted a buyer with a weapon or ever threatened to shoot or kill a buyer.

Appellant argues that Thompson's testimony about his shooting back at threatening rival drug dealers and his violent tactics in dealing with troublesome and dishonest drug customers should not have been admitted because it "served no legitimate purpose and allowed the government to argue that he was the sort of unusually violent person who would kill three people over a single crack rock."  To be sure, "[i]f evidence of prior bad acts that are criminal in nature and independent of the crime charged is offered to prove predisposition to commit the charged crime, it is inadmissible."[35]  This "is a principle of long standing in our law."[36]  But the

---

[34] Later in the trial, however, the defense moved to strike Thompson's testimony about appellant's treatment of drug buyers, arguing it was impermissible evidence of appellant's propensity for violence.  The court denied the motion; it viewed the testimony not as evidence of appellant's character or propensity, but rather as "background" information about the "tactics" appellant employed to maintain his control of drug dealing in Langdon Park.

[35] *Johnson*, 683 A.2d at 1092.

[36] *Jones*, 27 A.3d at 1142 (quoting *Drew*, 331 F.2d at 89).

government did not offer Thompson's challenged testimony to prove appellant's disposition to commit the crimes with which he was charged, and the prosecutor did not make a propensity argument such as that appellant was so unusually violent that he would commit murders over a mere rock of crack. Rather, the government primarily contended that evidence demonstrating and confirming appellant's central role in maintaining exclusive and firm control over the drug trade and drug buyers in Langdon Park was legitimately probative of appellant's *motive* for killing persons he perceived as having tried to steal crack from him and of his *identity* as the perpetrator of the murders.[37] For example, in closing argument, regarding appellant's motive, the prosecutor argued that he committed the murders "to keep [his] territory"; that, as a drug dealer in appellant's position, "you protected this area through your reputation" and "couldn't be seen as the drug dealer that folks get over on"; and that appellant shot the victims "because three [c]rack addicts came into his

---

[37] As we have said, the government also argued that Thompson's challenged testimony was admissible for the additional reason that it was "necessary to place the charged crime in an understandable context." *See Johnson*, 683 A.2d at 1098. We find it unnecessary to decide whether this separate ground was applicable to Thompson's testimony. (Contrary to appellant's argument in his reply brief, we do not understand the judge's ruling to have been limited to the rationale of *Johnson* such that admissibility under *Drew*, i.e., for motive and identity, was "a discretionary ground that the trial court did not reach" and thus (appellant argues) an improper basis for affirmance.)

park and tried to get one over on him and you cannot be the guy that people get over on."

This court has held that evidence of a defendant's prior criminal acts unrelated to the crime charged is admissible if three conditions are met: (1) the evidence is "offered for a substantial, legitimate purpose"; (2) the prosecution demonstrates by clear and convincing evidence that the defendant committed the prior criminal acts; and (3) the legitimate probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.[38] "Valid, non-propensity purposes 'includ[e], but [are] not limited to[,]' proof of identity [or] motive . . . ."[39] We conclude that these conditions were met in this case, and that the trial court therefore did not abuse its discretion by admitting Thompson's challenged testimony.

This court recognized in *Boone v. United States* that "evidence of drug-related activity is routinely admitted when it provides motive and context for other crimes, including homicide."[40] In that first-degree murder case we held that the trial court did not abuse its discretion in admitting, as probative of the defendants' motive to commit the charged murder, testimony that the defendants had firearms and served

---

[38] *Id.* at 1092-93 (internal quotation marks omitted).

[39] *Jones*, 27 A.3d at 1143 (quoting *Johnson*, 683 A.2d at 1092).

[40] 769 A.2d 811, 817 (D.C. 2001).

as enforcers and crack cocaine sellers for a drug distribution operation.[41]  We

explained that the trial court reasonably concluded that this testimony was "not

offered to prove [the defendants'] predisposition to commit the charged homicide"

but rather to show their motive, which was to fulfill their duty as enforcers and show

the leader of the drug operation that they were loyal.[42]

In the present case, the prosecution similarly offered Thompson's testimony

about appellant's shooting at the Montana Avenue crew and his aggressiveness

toward drug customers for the "substantial, legitimate purpose" of proving

appellant's motive and identity as the perpetrator of the Langdon Park murders.  We

are satisfied that the court reasonably judged the testimony to be relevant and

probative of those issues.  It would not have been enough for the prosecution merely

to elicit general testimony that appellant was in control of the drug trade in Langdon

Park.  Details of how appellant maintained that control also were admissible, even

if they involved prior bad acts, in order to "persuasively establish" the fact.[43]

---

[41] *See id.* at 813, 815-17.

[42] *Id.* at 816-17; *see also Jackson v. United States*, 329 A.2d 782, 790 & n.16 (D.C. 1974) (evidence that the defendant distributed drugs held admissible to prove that shooting was motivated by "a desire to eliminate a weak link in a drug distribution chain" and to avenge a friend's shooting).

[43] *Hagans v. United States*, 96 A.3d 1, 30 (D.C. 2014); *see, e.g., Minick v. United States*, 506 A.2d 1115, 1119-20 (D.C. 1986) (per curiam) (testimony about

We also are satisfied that the prosecution's evidence of appellant's drug dealing activity in Langdon Park, including the criminal behavior Thompson described, was clear and convincing.[44] The testimony on this point went uncontested at trial, and, on cross-examination, appellant's counsel actually amplified Thompson's account of appellant's behavior toward drug buyers.

Lastly, we are satisfied that the legitimate probative value of Thompson's challenged testimony was not substantially outweighed by the danger of unfair prejudice to appellant from that testimony. While Thompson called appellant a "bully" and a "loose cannon," his testimony that appellant was aggressive with drug buyers on occasion, and that appellant fired back at rival crew members who shot at

---

defendant's parole papers was admissible despite "imply[ing] . . . a prior criminal record" because "witnesses' specific references to a detail like the parole papers added 'narrative veracity' to their testimony and reinforced their credibility" (quoting *United States v. Williamson*, 482 F.2d 508, 514 (5th Cir. 1973))); *see also Jones*, 27 A.3d at 1147-48 (given high burden of proof in criminal trials, jury may reasonably demand more than "a story interrupted by gaps of abstraction" (quoting *Old Chief v. United States*, 519 U.S. 172, 189 (1997)).

[44] Appellant states in his reply brief that "the judge never made the requisite finding that these incidents were established by clear and convincing evidence, a prerequisite for *Drew*." We review a trial court's failure to sua sponte make that prerequisite finding explicitly on the record for plain error. *See Bacchus v. United States*, 970 A.2d 269, 275 (D.C. 2009) ("It is well established that, unless requested by a party, the absence of explicit findings is not necessarily reversible error."); *Daniels v. United States*, 613 A.2d 342, 347 n.11 (D.C. 1992). However, since appellant "raised this argument for the first time in his reply brief," we accordingly "do not address it." *Long v. United States*, 312 A.3d 1247, 1271 n.10 (D.C. 2024).

him, was brief and neither graphic nor inflammatory. Thompson did not testify to conduct by appellant comparable to, or suggestive of, the homicides and rape for which appellant was on trial. Nor did the prosecution cite the testimony to the jury as evidence of appellant's violent proclivities; it did not argue propensity at all.[45]

## 2. The Domestic Violence Evidence

In its direct examination of Odrianne Beckwith, the government took care not to elicit prejudicial testimony about appellant's violent behavior toward her during their relationship. At one point, when defense counsel became concerned that Beckwith might bring it up, the prosecutor explained in a bench conference that Beckwith had been cautioned in advance not to do so (e.g., "I specifically told her not to bring up the fact that he fired a gun at her"). The prosecutor offered to lead Beckwith through her testimony to avoid eliciting anything about appellant's violence against her, and defense counsel approved that approach. Thus, during Beckwith's direct examination, the jury heard only that she and appellant had been

---

[45] *See Hagans*, 96 A.3d at 30 (explaining that while "other crimes evidence should omit, where possible, unnecessary details of the defendant's violence and use of a weapon," it was not an abuse of discretion to admit "evidence" showing "wanton violence" where, inter alia, it was probative of the defendant's possession of the crime weapon and the prosecution did not "exploit[] the evidence to prejudice the jury against him" (quoting *Jenkins v. United States*, 80 A.3d 978, 999 (D.C. 2013))).

arguing, that appellant had accused her of infidelity, and that he said he could kill her as he had killed three people in the past.

On cross-examination, the defense sought to show that Harry Sullivan had been Beckwith's paramour and that he had induced her to implicate appellant in criminal activity. As counsel clarified this defense theory for the court in a bench conference, Sullivan himself had entered into a cooperation agreement with the police, and the defense posited that he had "prompted" Beckwith to help him by corroborating what he was telling the police about appellant's criminal activities— including, eventually, by falsely reporting that appellant had confessed to the Langdon Park murders. The judge warned defense counsel that their theory would open the door for the government to "show directly or indirectly why that's not credible" and "not true."[46] The defense was not deterred by the court's warning.

In support of the collusion theory, defense counsel pressed Beckwith to admit on the witness stand that she had been in a sexual relationship with Harry Sullivan in 2002 when her relationship with appellant was breaking down. Beckwith responded that she had been friends with Sullivan (whom she had met through

---

[46] The prosecution had argued that if the defense pursued this line of questioning, it would introduce, among other things, evidence of appellant's felony assault against Beckwith.

appellant), but she emphatically denied ever having had a "sexual" or "romantic" relationship with him.[47] In response to further questions, Beckwith also said she had no memory at all (possibly on account of the memory loss she suffered after the car accident, *see* note 8, *supra*) of ever having talked with Sullivan about his status and benefits as a cooperating witness, or of Sullivan telling her he would send a detective to get information from her in 2002 or 2003. Beckwith recalled that a detective did eventually contact her, but she understood it was because appellant "was about to be released from jail."

However, defense counsel did succeed in obtaining Beckwith's agreement that her relationship with appellant "didn't end particularly pleasantly" (as counsel put it in a leading question to which Beckwith assented), and that their relationship finally came to an end when she went to the Fifth District police station in July 2002, told the police appellant had guns and drugs in the house, and gave them written permission to search the premises. As a result, Beckwith acknowledged, appellant was arrested and he eventually pleaded guilty to "some charges." Defense counsel did not ask Beckwith why she reported appellant to the police in 2002, leaving the

---

[47] There was no evidence at trial supporting the suggestion that Beckwith and Sullivan were ever lovers.

implication that Beckwith was spiteful and might have gone to the police at Sullivan's instigation, in line with the defense collusion theory.

Beckwith also admitted on cross-examination that she did not report appellant's confession to the Langdon Park murders until three years later, when she went before the grand jury in 2005. Counsel did not ask her why she did not report appellant's admission when she first went to the police in 2002, leaving the implication that her belated account of his murder confession might have been a fabrication (also in line with the defense theory of her collusion with Sullivan).

In addition, the defense showed Beckwith phone records that appeared to evidence her continuing communications with Sullivan in 2016, close in time to the date of her appearance before the grand jury that eventually indicted appellant for the murders. Thus, in sum, the cross-examination of Beckwith, taken at face value, arguably tended to support the defense effort to portray her as appellant's vindictive ex-girlfriend who went to the police and falsely incriminated appellant in the Langdon Park murders at her new lover's urging.

The trial court agreed with the prosecutor that this cross-examination opened the door for the government, on redirect examination, to elicit what the government believed to be the actual reason Beckwith went to the police in 2002. The true reason, the government contended, had nothing to do with Sullivan's malignant

influence or Beckwith's supposed desire to help Sullivan by corroborating his allegations against appellant and echoing a fabricated account of appellant's confession to the Langdon Park murders. Rather, Beckwith went to the police in desperation, as a victim of domestic abuse seeking protection from appellant.

At the outset of the redirect examination, the prosecutor asked Beckwith whether she "ever had any kind of a romantic relationship with Harry Sullivan." As before, Beckwith answered, "No." She confirmed that appellant repeatedly accused her, unjustly, of carrying on romantic relationships with others. Beckwith also stated that she did not know anything about Harry Sullivan having been a cooperating witness.

The prosecutor asked Beckwith "what [her] relationship was like with Mr. Valdez." Beckwith answered that it "was not a very good relationship. It was a very unhealthy relationship. One that I've blocked so deep inside of me because it was not a good relationship." Beckwith testified that appellant was physically violent with her. She said she had "tried so many, so many days and nights to . . . forget that violent part of it." She did not recall whether appellant ever had threatened her with a weapon. "But what I do remember," she testified, "is my neck being choked out on several occasions . . . ." The prosecutor next asked Beckwith what she remembered about going to the Fifth District police station in 2002, "the

part that does stand out in your mind." Beckwith answered, "I needed to get [appellant] out of my house." "[W]hy?" the prosecutor asked. "For the safety of myself and my children," Beckwith answered.[48]

Beckwith did not remember everything she "specifically" said to the police in 2002. "As best as I recall," she testified, "I believe I told them the truth."

When Sullivan thereafter took the witness stand, defense counsel questioned him extensively about his contacts with Beckwith. Sullivan too denied having had "any kind of intimate relationship" with Beckwith. However, when counsel asked him whether he had ever gone to Beckwith's house, Sullivan said he had gone there once, but also said he never went there to see Beckwith and he did not recall going there to see appellant. Defense counsel did not inquire further into the visit. The

---

[48] In closing argument, the prosecutor cited this testimony to explain why Beckwith did not tell the police in 2002 about appellant's admissions to having committed the Langdon Park murders. The prosecutor argued:

> The Defense says you can't believe her because when she went to the police in 2002, she didn't tell them about what Mr. Valdez did in the Park.

> She told you on Redirect. When she went to the police in 2002, she was in an abusive relationship with Mr. Valdez. He had just choked her and all she was worried about was the safety of herself and her family. She wasn't worried about telling them about something he confessed to that happened 11 years earlier. Does that mean she's not credible[?] Does that mean she's part of some conspiracy with Harry Sullivan?

obscurity of Sullivan's answers to the questions about his one-time visit to Beckwith's house may have suggested to the jury that he was hiding something about his relationship with Beckwith, in line with the defense claim.

On cross-examination by the government, Sullivan reiterated that he had never been "romantically involved" with Beckwith and had never had "sex with her." The prosecutor then asked Sullivan about the time he said he had gone to Beckwith's house. Over defense counsel's objections that the inquiry was beyond the scope of direct, which the court overruled (and which appellant does not press on appeal),[49] Sullivan testified that when he arrived there, he saw appellant assaulting Beckwith, and that she fled to him for help:

> She ran—she was running out the house to me and my buddy that was with me, and we jumped out the car. And he was trying to choke her. He hit her on the steps. And I was, like, you can't do that. And I got into it and me and him tussling and she ran to the car to my buddy.

Sullivan testified that appellant then accused Beckwith of evidently wanting to have sex with Sullivan.

---

[49] The defense did not object at trial to the relevance of the cross-examination or contend that it was unduly prejudicial, nor did it move to strike Sullivan's testimony about appellant's assault on Beckwith.

We conclude that the trial court did not abuse its discretion in ruling that the defense examinations of Beckwith and Sullivan opened the door to the testimony of those witnesses about appellant's violently abusive treatment of Beckwith. By itself, the cross-examination of Beckwith opened the door for the prosecution to elicit not only her testimony about that violence but also Sullivan's corroborative testimony that he had seen appellant assault Beckwith in the very manner she claimed he had.

Under the doctrine of curative admissibility recognized by the decisions of this court, the prosecution may be allowed to introduce otherwise inadmissible evidence after the defense has "opened the door" to it.[50] "At bottom, the notions of 'opening the door' and 'curative admissibility' rest on the more general concept that the balance of prejudice against probative value may change during the course of a trial"[51] as a result of the approach taken by the defense. The "test," then, is "whether

---

[50] *See Furr v. United States*, 157 A.3d 1245, 1251-52 (D.C. 2017); *Busey v. United States*, 747 A.2d 1153, 1166 (D.C. 2000); *Mercer v. United States*, 724 A.2d 1176, 1192 (D.C. 1999). We pause to note that, although we speak here of applying the doctrine of curative admissibility when the door is "opened" by the defendant in a criminal case, the doctrine is applicable to the prosecution as well, and in civil cases. We note also that we have "enjoined" trial judges "to exercise caution and restraint before relying on the curative admissibility rationale" because "the idea that the one side might 'open the door,' is often oversimplified." *Furr*, 157 A.3d at 1252.

[51] *Busey*, 747 A.2d at 1166.

the risk of unfair prejudice substantially outweighs the probative value of the proffered evidence."[52]

Accordingly, other-crimes evidence that is not admissible against a defendant to prove propensity or under *Drew* or the *Johnson* exceptions may be rendered admissible if the defense, through delimited, incomplete, or misleading examination of a witness, invites factual inferences materially adverse to the prosecution that revelation of the criminal context would dispel or undercut. In *Busey*, for example, the trial judge initially permitted a prosecution witness to testify to having seen the defendant with a gun two days before the charged murder, but precluded the prosecution from "eliciting the context—that Busey held the gun to [the witness's] head and pulled the trigger—during [the witness's] direct examination."[53] However, "this exclusionary ruling was provisional, because the balance of probative value versus unfair prejudice could be altered by defense counsel's cross examination of" the witness.[54] That alteration occurred when, on cross-examination, defense counsel challenged the witness's claim to have seen Busey with a gun by eliciting her inability to remember details of the incident. "At that point," we held, "the probative

---

[52] *Id.* (citing *Johnson*, 683 A.2d at 1092-93).

[53] *Id.* at 1165.

[54] *Id.* at 1166.

value of testimony about the assault increased dramatically[, and t]he context became highly relevant in evaluating whether to believe [her]," as she could explain that "she vividly remembered seeing Busey with a gun because he threatened her with it."[55]

In the present case, testimony about appellant's violent crimes against Beckwith was presumptively inadmissible during her direct examination by the prosecution, and the prosecution did not seek to elicit such testimony at that time. Such other-crimes evidence was not legitimately probative of appellant's guilt of the crimes charged. But as the trial court warned it might, the probative balance shifted when the defense cross-examined Beckwith. Through targeted cross-examination, the defense suggested that Beckwith's relationship with appellant had not ended "pleasantly"; that she had taken another lover, Sullivan, who was cooperating with the police; that she vindictively reported appellant's crimes to the police at Sullivan's bidding and for his benefit as a cooperator; and that her failure to tell the police about appellant's murder confession when she reported his drug and gun offenses in 2002 implied that the confession was a later fabrication, attributable to her collusion with Sullivan. At that point, to paraphrase what we said in *Busey*, the probative value of testimony about appellant's violent abuse of Beckwith increased dramatically,

---

[55] *Id.*

because it tended to refute the defense theory of collusion by providing a plausible alternative explanation for Beckwith's conduct and testimony. The prosecutor argued to the jury that Beckwith's desperate need for immediate protection from appellant's assaults explained why she didn't think to mention his incriminating admissions to old crimes against other, unknown persons when she went to the police for help in 2002. This answered the suggestion that her reports of appellant's confessions to the Langdon Park murders must have been later fabrications.[56]

We are satisfied that the risk of unfair prejudice to appellant from the admission of the domestic violence testimony did not substantially outweigh the considerable probative value of the testimony. To paraphrase *Busey* again, "[w]e do not doubt that the evidence of [appellant's] assault[s] on [Beckwith] was prejudicial to [him]. . . . But because the relevance of the assault[s] increased dramatically after the cross examination of [Beckwith], we are satisfied that the trial judge exercised [her] discretion soundly in concluding that testimony about the assault[s] would be

---

[56] The persuasiveness of this answer in explaining why Beckwith did not report appellant's murder confessions in 2002 (or in the intervening years prior to her grand jury testimony) was ultimately for the jury to decide. Defense counsel was free to argue that appellant's domestic violence would have actually given Beckwith an even greater incentive to tell the police that appellant had confessed to three murders and thereby increase the likelihood of his arrest and continued incarceration.

admissible on redirect despite the risk of prejudice."[57] The jury in this case "was not asked improperly to infer criminal propensity from the evidence of the prior assault[s]."[58]

We therefore hold that the trial court did not abuse its discretion in ruling that the cross-examination of Beckwith opened the door to evidence of appellant's violent assaults on her. In presenting such evidence, the government was not limited to just Beckwith's own testimony where, as here, it could be corroborated by the testimony of a professed eyewitness to the violence, namely Sullivan. Of course, Sullivan was not merely such an eyewitness. He also was the person whom the defense accused of being Beckwith's paramour and conniving with her (and others) to falsely report that appellant had confessed to the Langdon Park murders; and it was defense counsel who raised the subject of Sullivan's visit to Beckwith's house on direct examination, implying it was further evidence of their intimacy. Sullivan's testimony about the visit on direct was inconclusive. All this amounted to an open invitation to the prosecutor, on cross-examination, to ask Sullivan what happened on that visit, if only to support or rehabilitate the witness's credibility and dispel the suspicions raised on direct examination. So even assuming arguendo that appellant

---

[57] *Id.*

[58] *Id.* at 1167.

has preserved an objection to Sullivan's eyewitness testimony of appellant's assault on Beckwith (*but see* note 49, *supra*), we are not persuaded that the trial court erred in admitting it.

## C. Rulings Limiting Defense Cross-Examination and Presentation of Extrinsic Evidence to Show Bias of Prosecution Witnesses

Appellant argues that he was denied his constitutional right to demonstrate the bias of witnesses against him by two rulings of the trial court. One of the rulings precluded defense counsel from cross-examining Michael Green about the facts underlying the second-degree murder charge to which he had pleaded guilty (along with the three voluntary manslaughter counts arising from the Langdon Park homicides) as part of his cooperation agreement. The other ruling prevented the defense from calling appellant's daughter to testify that Harry Sullivan had sexually molested her in 2002, after Sullivan had denied that allegation on cross-examination.

The constitutional right appellant invokes is the Sixth Amendment right of the accused in a criminal trial to be "confronted with the witnesses against him."[59] This right of confrontation guarantees a criminal defendant's right to expose the motivation and bias of adverse witnesses, "not only through cross-examination, but

---

[59] U.S. Const. amend. VI.

also by the introduction of extrinsic evidence."[60] This court has held it to be "immaterial under the Sixth Amendment whether the adverse witness has been called by the defense or the government, so long as [the attempt to expose the witness's bias] is not a 'mere subterfuge' to present otherwise inadmissible evidence."[61]

However, as the Supreme Court has stated, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits" on bias cross-examination or the presentation of extrinsic evidence of an adverse witness's bias.[62] Such limits, committed to the trial court's discretionary judgment, may be "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant."[63] The Supreme Court has emphasized that "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not

---

[60] *Longus v. United States*, 52 A.3d 836, 852 (D.C. 2012).

[61] *Id.* at 849-50 (citation and footnote omitted).

[62] *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

[63] *Id.*

cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."[64]

Quoting *Van Arsdall*, we have held that "a violation of the Sixth Amendment is established if 'a reasonable jury might have received a significantly different impression of the witness's credibility had defense counsel been permitted to pursue the proposed line of cross-examination.'"[65] By a parity of reasoning, this test applies as well to rulings precluding the introduction of extrinsic proof of bias. We view this test as encompassing the principle, invoked by appellant, that "[i]t is not enough that the possibility of bias be mentioned; counsel must be permitted to present the nature and extent of the bias."[66] The *Van Arsdall* test that we endorsed in *J.W.* is the test we will apply here to appellant's claims.

---

[64] *Id.* (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)).

[65] *In re J.W.*, 258 A.3d 195, 203 (D.C. 2021) (brackets omitted); *see also id.* at 202-03 (reviewing the "wide variety of formulations" in our case law of the scope of the Sixth Amendment right to cross-examine, and ultimately focusing on the Supreme Court's statement in *Van Arsdall*, 475 U.S. at 680, as appropriately "fram[ing] the 'controlling question'"); *accord Williams v. United States*, 268 A.3d 1265, 1272 (D.C. 2022); *see also Longus*, 52 A.3d at 852 ("A trial court's 'refusal to allow questioning about facts indicative of [a witness's] bias from which the jury could reasonably draw adverse inferences of reliability is an error of constitutional dimension.'" (alteration in original) (quoting *Cunningham v. United States*, 974 A.2d 240, 245 (D.C. 2009))).

[66] *Longus*, 52 A.3d at 851.

### 1. The Limitation of Green's Cross-Examination Regarding the Facts Underlying His Plea to Second-Degree Murder

One of the crimes to which Michael Green pleaded guilty as part of his cooperation agreement with the government related to a homicide he committed in 1999 in the Edgewood neighborhood of Washington, D.C.  Green was arrested for that homicide in July 2015 and charged with first-degree murder while armed.[67]  His deal with the government allowed him to plead guilty to the lesser offense of (unarmed) second-degree murder (in addition to three counts of voluntary manslaughter arising from the Langdon Park murders).  At trial, the government moved in limine to preclude the defense from cross-examining Green about the "specific details" of the Edgewood murder.  The government acknowledged that it would be proper for the defense, in exposing Green's testimonial bias and motivation, to examine him about his plea deal—in particular, about the charges and the lesser offenses to which he was allowed to plead guilty, and the potential penalties he faced before and after the plea (as well as about Green's obligations, expectations, and other details of his agreement to cooperate).  The government argued, however, that cross-examination of Green on the specific details of the Edgewood murder (which was not, of course, one of the crimes for which appellant

---

[67] This was several months before he and appellant were arrested and charged with the unrelated Langdon Park murders in February 2016.

was on trial) would be inappropriate because "the defense is not entitled to a mini-trial involving every potential charge or allegation," and exploration of the specific details of the crime would not be necessary (in the government's view) to enable the jury to make a "discriminating appraisal of the witness's motives and bias."[68]

In a written opposition, appellant objected to the proposed limitation. He argued that the specific manner in which (he proffered) Green had committed the Edgewood murder—by stabbing the unarmed victim in the back—was relevant to the issue of his bias because "some murders are more heinous than others," and a jury could conclude that "a witness who committed a more heinous murder would naturally have a greater motive to curry favor with the government" than a person who "did not commit as heinous a killing."

The trial court ruled in favor of the government's position. The judge stated that "what [Green] was charged with [for the Edgewood murder], what he was facing, what he pled guilty to, what he's facing now, all of that is fair game" on cross-examination for bias. However, the judge continued, she had "no intention of having any mini trials within a trial in this case about other charges," and she did not "see any basis for the underlying allegations or facts" of the Edgewood murder

[68] Quoting *Longus*, 52 A.3d at 851 (quoting *United States v. Graham*, 83 F.3d 1466, 1474 (D.C. Cir. 1996)).

charge "to come in." Defense counsel asked to be permitted to cross-examine Green briefly on the fact that he initially told the police his "codefendant in [the Edgewood murder] case did everything, did the violent act and [Green] didn't do anything." Counsel explained that she sought "to ask that question because this is somebody who shifts blame. My theory with him is that he tries to minimize his role . . . even though he had an agreement" to cooperate (as in the present case). The court said this would be "fine," and that it was "not saying the defense can't cross-examine about the nature of the bias. But the defense can't cross-examine about anything that would deal with the underlying details of the crime."

In Green's ensuing testimony, on both direct and cross-examination, the bases for his motivation to cooperate with the prosecution, plead guilty, and testify against appellant were thoroughly explored for the jury to consider. The defense introduced his plea and cooperation agreement in evidence. Among other things, the jury learned that Green had pleaded guilty to three counts of voluntary manslaughter for the Langdon Park murders and one count of second-degree murder for the Edgewood murder, and had agreed to cooperate with the government and testify truthfully, in exchange for the dismissal of the greater and additional charges arising from those crimes (i.e., including four counts of first-degree murder while armed) and the government's promise not to prosecute him for drug dealing in the District of

Columbia, and the expectation of leniency at sentencing if he fulfilled his commitments.

Green admitted that, when he entered into this agreement, he was "scared," knowing he might spend the rest of his life in prison if convicted of the murders. The jury learned that even the reduced offenses to which Green pleaded guilty exposed him to lengthy prison sentences—twenty years to life on the second-degree murder count and fifteen years to life for each of the three voluntary manslaughter counts. But as the jury also heard, Green had "no intention of doing 65 [years] to life" and "hope[d] not" to do anywhere near that after he cooperated with the government pursuant to his agreement. He explained that his "hopes" to receive a lenient sentence for living up to his commitments were based on the government's promise to tell his sentencing judge about the information he provided in aid of the prosecution of this and other cases. And Green repeatedly testified that he understood his hopes depended on his truthfulness and, by clear implication, whether the government was satisfied with his truthfulness and cooperation.

Underscoring the strength of his motivation to do everything within his power to fulfill his bargain with the government, Green also acknowledged on cross-examination that he had much to lose if he did not succeed in receiving a lenient sentence. He had a fiancée, a son, a "nice home," and his "life was good." Green

had reassured his fiancée that he would be "coming home" soon and they had discussed their future plans upon his return. He was strongly motivated to enable himself to return to his happy life and fulfill those plans.

The trial court's ruling on the motion in limine also did not impede the cross-examination sought by defense counsel regarding Green's initial attempt to minimize his complicity in the Edgewood murder. Green admitted that he first told the government that "[he] didn't actually do the stabbing, it was just the other man," and only later admitted the "truth" that he had stabbed the victim himself.[69] Green also admitted that he similarly had tried to "minimize" his involvement in the Langdon Park killings when, at first, he told the government he did not have a gun at the time of the shootings. (Eventually, after it was clear the police did not believe him, Green recanted and conceded that he did have a gun in Langdon Park.)

We are satisfied that the trial court's ruling on the motion in limine was a narrow one that permitted defense counsel to present the nature and extent of Green's bias. The cross-examination exposed his powerful incentives to do what the

---

[69] Thus, we note, the jury did learn the "specific facts" that Green committed the Edgewood homicide by stabbing the victim to death, and that he was the principal rather than an aider and abettor. As these facts were undisputed, they did not threaten to result in a "mini trial" over other aspects of the killing, such as whether the victim was armed, where and how he was stabbed, Green's motive for the killing, or whether there were any mitigating circumstances. There was no suggestion of any extenuating circumstances in the Edgewood homicide.

government wanted him to do and testify against appellant. The problems with Green's credibility—not just his self-interest and all he had at stake, but also his admissions on the witness stand to having tried to minimize his own culpability at the expense of co-defendants even when he was "cooperating" with the government—were on display. The defense was well-armed to argue that Green's powerful motives to advance his own interests at appellant's expense made him a biased and untrustworthy witness.

We are not persuaded that revelation of additional facts about how or under what circumstances Green committed the Edgewood murder would have given a reasonable jury "a significantly different impression" of appellant's credibility as a witness against appellant. Specific details of the Edgewood murder were hardly necessary to convey to the jury that Green had committed a "heinous" offense subject to severe sanction; a malicious taking of a human life without justification, excuse, or mitigation is presumptively heinous and, more importantly, the jury was informed that Green was exposed to a lengthy term of incarceration (twenty years to life) for the offense.[70] If Green had denied having committed the Edgewood murder

---

[70] *See Williams*, 268 A.3d at 1272 ("Although defense counsel was precluded from asking any questions about the facts underpinning that charge, counsel was 'permitted to present the nature and extent of the [possible] bias' by bringing to light the fact that there was a charge pending against [the witness], the nature of that

or had materially mischaracterized it, then it might well have been necessary to allow defense counsel to elicit the underlying facts in order to show the true nature and extent of Green's bias.[71] But that was not the case here. The in limine ruling therefore did not impede the accurate and effective exposure of Green's motivation or otherwise prejudice appellant. Rather, we hold, the ruling was within the court's discretionary authority to impose reasonable limits on bias cross-examination to avoid confusion of the issues and interrogation of only marginal relevance.

### 2. The Exclusion of Testimony from Appellant's Daughter Offered as Extrinsic Evidence of Harry Sullivan's Bias

The goal of the defense in calling Harry Sullivan as a witness was to impeach the "earwitness" testimony of Edmonds, Beckwith, and Neeka Sullivan that they heard appellant admit to the Langdon Park murders. The theory of the defense was that Sullivan—who testified on direct examination that he, too, heard appellant

---

crime, and the potential penalty." (alteration in original) (quoting *Longus*, 52 A.3d at 851)).

[71] *See, e.g.*, *In re J.W.*, 258 A.3d at 203-04 (where defense counsel sought to show that pending armed-robbery charges gave witness a motive to curry favor with the prosecution, and the witness denied having such a motive because she was innocent, counsel should have been permitted to cross-examine the witness about the facts underlying the charges from which the jurors could evaluate the witness's disavowal of partiality); *Longus*, 52 A.3d at 850-51 (where detective acknowledged he was being investigated for allegations of witness tampering, but denied the substance of the allegations, the trial court's refusal to permit defense counsel to question the detective about the underlying facts prevented counsel from eliciting enough information to enable the jury to appraise the detective's motives and bias).

admit the murders—had colluded with the other three earwitnesses in 2005 to falsely inculpate appellant. "Our whole theory about these confessions," defense counsel told the trial court, "is [that] they originated with Mr. Sullivan." However, though Sullivan was a defense witness, he denied this accusation. In the absence of any other proof that he had orchestrated an agreement among the earwitnesses to implicate appellant by reporting his supposed confession to the police, the defense sought to show that Sullivan himself had a strong motive to incriminate appellant (and therefore, implicitly, to enlist others to help him do so).

The defense theory advanced at trial was that Sullivan's motive to falsely accuse appellant stemmed from his sexual molestation of appellant's daughter sometime in 2002 (when she was twelve years old). It appears that the child had made an accusation of that kind to Sullivan's mother, who had discounted it. No claim of such molestation had ever been made to the authorities, and appellant himself had not confronted Sullivan about it. Nonetheless, the defense posited, Sullivan must have feared not only the possibility of criminal prosecution if his abuse of appellant's daughter were ever to be reported (the statute of limitations still had not run), but also the possibility of retaliation from appellant; for even though appellant was incarcerated in 2005 (serving time in prison on unrelated drug charges), he was due to be released soon. So, defense counsel argued to the trial court, Sullivan had a dual motive to implicate appellant in the Langdon Park

murders—both to curry favor with the government (even before any criminal investigation had begun) and to keep appellant locked up (unable to avenge himself on Sullivan).

Defense counsel was not prevented from cross-examining Harry Sullivan about the sexual abuse allegation to establish his bias. However, Sullivan dismissed the allegation as completely false.[72] He also denied having known about the claim when he told the grand jury about appellant's confession in 2005. Consequently, the defense proposed to present extrinsic evidence to prove Sullivan's bias by calling appellant's daughter to testify that Sullivan did indeed molest her in 2002. If her testimony were credited, it would mean that Sullivan might have had the posited motivations when he first implicated appellant in the Langdon Park murders.

The trial court precluded the daughter's testimony, however, ultimately ruling that "the truth of the allegation is not properly litigated in this case," and that it did not "matter whether it's true," because Sullivan's admitted awareness of the accusation by the time of trial sufficed by itself to support the claim of his testimonial bias. The court also identified other concerns that supported its ruling, notably the unattractive prospect of a "trial within a trial" and what the court anticipated would

---

[72] The defense also questioned Neeka Sullivan about the allegation. She too dismissed it as false.

be the difficulty of assessing the truth of the allegation of abuse given its age and the absence of a contemporaneous report of it.

We agree with appellant that the trial court committed "an error of constitutional dimension"[73] in precluding the defense from calling his daughter to testify to facts—Sullivan's alleged sexual abuse of her—from which the jury could infer that Sullivan was biased when he first reported that appellant had admitted the Langdon Park murders.  For the bias to matter in this case, it had to exist when Sullivan first made that report.

Appellant was afforded the opportunity to try to establish the basis for Sullivan's bias through cross-examination of him.  He was thwarted by Sullivan's denials.  But "[b]ecause bias is not a collateral issue, 'evidence from which the jury can infer bias may be presented not only through cross-examination, but also by the introduction of extrinsic evidence.'"[74]  Such extrinsic proof of a witness's bias is most appropriate when it is necessary in order to establish the factual basis of the claim because the witness has denied that basis.  We are persuaded that the test for a constitutional violation has been met in this instance: a reasonable jury might have

---

[73] *Longus*, 52 A.3d at 852.

[74] *Coates v. United States*, 113 A.3d 564, 570 (D.C. 2015) (quoting *Longus*, 52 A.3d at 852).

received a significantly different impression of Sullivan's credibility had defense counsel been permitted to present testimony that he had molested appellant's daughter, and that this occurred before he ever implicated appellant in the Langdon Park murders.

Nonetheless, we conclude that this constitutional error does not entitle appellant to relief. That is because we perceive that the error could not have affected the jury's verdict and therefore was harmless beyond a reasonable doubt.[75]

Proof of Harry Sullivan's alleged bias—his imputed fear of appellant's retaliation and incentive to curry favor with the government—was important only to the extent that it increased the plausibility of the defense theory that Sullivan colluded with the government's earwitnesses in 2005 to perpetrate a lie that appellant had confessed to the Langdon Park murders.

But even assuming Sullivan's postulated bias would have been shown by credible testimony from appellant's daughter, the defense theory would still have been unsupported and highly implausible. First, although each of the government's

---

[75] *See Van Arsdall*, 475 U.S. at 684 ("The correct inquiry [in the event of a Confrontation Clause error] is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.").

earwitnesses knew Harry Sullivan and were involved with him in one way or another,[76] there still would have been no evidence at trial that they conspired to falsely incriminate appellant. To the extent the witnesses themselves were asked about such collusion, they denied it, and their denials were not impeached. That there were similarities in what each witness reported appellant had said was not indicative of collaboration; there is no reason to think that if the witnesses were telling the truth, they would have reported that appellant told materially different stories to each of them. Even if the four earwitnesses did talk among themselves about reporting appellant's confessions (which was not demonstrated), that does not mean they were colluding or lying about them.[77] And the confessions were corroborated by other evidence, not falsified or contradicted in any meaningful way.

That brings us to the fundamental flaw in the defense theory of collusion, a flaw that could not have been cured by any proffered testimony from appellant's daughter. The supposition that the earwitnesses made up appellant's confessions in

---

[76] Neeka Sullivan was Sullivan's mother, Beckwith knew him through appellant and maintained some contact with him, and Edmonds had sold drugs with Sullivan along with appellant.

[77] Some of the earwitnesses admitted on cross-examination that, even though they had not kept in touch generally, they had spoken with one another by phone shortly after their grand jury testimony. But it would require a significant speculative leap on the jury's part to conclude that these phone calls were about a scheme to provide false testimony to the grand jury.

order to falsely implicate him in the Langdon Park murders implies it was just an extraordinary and unforeseeable coincidence when those supposedly fabricated confessions turned out to be powerfully corroborated a decade later by the recovery of appellant's DNA from semen stains on the sexual assault victim's clothing, along with the testimony of an admitted accomplice and eyewitness to the murders, and corroborating witnesses.[78] The utter implausibility of such a coincidence strikes at the heart of the defense theory of collusion and fabrication. The DNA evidence and the other corroborative evidence confirmed that the earwitnesses were telling the truth about appellant's confessions.

For the foregoing reasons, we think any reasonable jury would have rejected the defense theory as both unsupported and contradicted by the evidence, even if appellant's daughter had testified and provided credible extrinsic evidence of Sullivan's bias. We therefore conclude that the error in excluding the daughter's testimony did not prejudice appellant and was harmless beyond a reasonable doubt.

---

[78] Appellant (understandably) does not contend the alleged colluders had other (undisclosed) grounds in 2005 to believe he had anything to do with the Langdon Park murders.

**D. Appellant's Objections to the Curative Instruction Given During the Defense Closing Argument, and to the Government's Rebuttal Argument**

During the defense closing argument, the prosecutor objected to what she perceived to be an improper suggestion that the government had undertaken to conceal evidence from Michael Green's debriefings that would have weakened the force of his testimony and the prosecution case against appellant. The court shared that perception of the defense argument and responded by instructing the jury that the government had fulfilled its obligation to turn over any exculpatory evidence in its possession. This was not in dispute; there was no evidentiary foundation for a claim of wrongful concealment of evidence by the government, and defense counsel had stated she would not "mind [if] the [c]ourt would instruct the jury that there were no materials that were supposed to have been turned over that [weren't] turned over."

Appellant contends, however, that the defense argument did not accuse the government of withholding exculpatory evidence, and that the court's instruction "gutted" a legitimate argument—that the lack of a record corroborating when Green provided information to the government in his debriefings supplied a reason to doubt his testimony and appellant's guilt. Based on that contention, appellant moved for a mistrial or other relief, which the court denied. Appellant further argues that the court compounded its error by allowing the government to imply in its rebuttal

argument that there actually was a corroborative record of the debriefings, which the rules of evidence just did not allow the government to present at trial.

Our review of the court's challenged instruction and rulings is for abuse of discretion.[79] We are satisfied that the court did not abuse its discretion in giving its curative instruction, denying a mistrial or other requested relief, and overruling the defense objection to the government's rebuttal argument.

## 1. Background

As the parties stipulated at trial, the first time that Michael Green spoke with the government about the Langdon Park murders was on August 31, 2016, when he was debriefed by a police detective and the same Assistant U.S. Attorney (Ms. Laura R. Bach) who conducted Green's direct and redirect examinations at trial. This initial debriefing was for the purpose of exploring the possibility of a plea deal. Prior

---

[79] *See, e.g.*, *Tornero v. United States*, 94 A.3d 1, 9 (D.C. 2014) ("Because a trial court has broad discretion in controlling the scope of closing argument, we review a decision to restrict such argument [for] . . . abuse of discretion." (alteration and omission in original) (quoting *Haley v. United States*, 799 A.2d 1201, 1207 (D.C. 2002))); *Trotter v. United States*, 121 A.3d 40, 53 (D.C. 2015) ("The decision whether to grant a mistrial motion in lieu of alternative relief in response to a prejudicial development at trial is committed to the trial court's discretion. We will reverse a discretionary denial of a mistrial only if the trial court's decision 'appears irrational, unreasonable, or so extreme that failure to reverse would result in a miscarriage of justice.'" (footnote omitted) (quoting *Coleman v. United States*, 779 A.2d 297, 302 (D.C. 2001))).

to the debriefing, the government had taken DNA swabs from Green and appellant, and it had disclosed at a court hearing in their case that an independent laboratory, Bode Cellmark Forensics, would test the semen stains on the clothing of victim Samantha Gillard for the presence of their DNA. The results of the testing were still unknown at the time of Green's August 2016 debriefing.

In Green's direct examination at trial, the prosecutor asked him whether, during that first debriefing, he had said "anything about the DNA testing that was about to be done." Green answered that "I told you that the DNA would come back for Benito [i.e., appellant] on the young lady."

Green did not have another meeting with the government until May of 2017; up until then, the government was unwilling to enter into a plea agreement with him because of concerns about his truthfulness. (As the government disclosed, and as Green admitted at trial, he had persisted in his debriefing in attempting to minimize his culpability, for example, by denying that he had a gun at the time of the Langdon Park murders.) The perception of Green changed, however, when Bode Cellmark Forensics reported the results of its DNA testing to the government on April 25, 2017. Those results verified Green's assertion that appellant's DNA would be found in the semen samples from Gillard's clothing. Green then resumed talks with the government in May 2017, which culminated in the plea and cooperation agreement

that Green signed on June 2, 2017. Green had several subsequent meetings with the government in preparation for appellant's trial, which commenced in January 2018.

When appellant's trial counsel cross-examined Green, she did not challenge (or even ask about) his testimony that he told the government in August 2016 that appellant's DNA was on Gillard's clothing. When the government rested, that testimony appeared to be undisputed.

In the defense case, however, appellant called Metropolitan Police Detective Michael Fulton, the detective who had participated in Green's debriefing meetings. Neither party asked Detective Fulton about anything Green told him and the prosecutor in those meetings, or when he first told them about anything, nor about the DNA evidence at all. Rather, defense counsel focused on whether contemporaneous recordings or notes had been made or taken in the meetings. Detective Fulton testified that no video or audio recordings were made, and that it is not his practice to take notes during debriefings because "the prosecutors[] typically take all the notes of what's going on in the debriefing." On cross-examination, Detective Fulton confirmed that "the prosecutors often type things up later," and that in this case, Green also was "put into the grand jury . . . [a]nd his statement was memorialized under oath."

On redirect, defense counsel attempted, over government objection, to elicit testimony from the detective that it was "a practice" not to take notes in witness debriefings "[s]o there's no record of the fact their witnesses give different versions" that the defense could use to impeach the witnesses. Defense counsel argued that "a jury might wonder why you meet with somebody and don't write notes down," to which the court responded that Detective Fulton had testified that "somebody else [i.e., the prosecutor] took notes." Defense counsel denied that she was suggesting anything "nefarious" on the part of the government, but she admitted that "the jury could think that." Defense counsel then stated she would have no objection if the court were to instruct the jury that "there were no materials that were supposed to have been turned over that [weren't] turned over," and that "the [c]ourt could certainly say there was nothing from the debriefing that existed that we didn't get," because "[t]hat's not our argument." Ultimately, however, the court sustained the government's objection to the proposed line of questioning on the ground that it was beyond the scope of the cross-examination.[80]

## 2. Closing Argument and Rebuttal

In closing argument, the prosecutor cited as evidence of Green's credibility the (seemingly undisputed) fact that before anyone knew the results of the DNA

---

[80] That ruling is not challenged on appeal.

testing, Green told the government in his August 2016 debriefing that appellant's DNA would be in the semen samples recovered from Gillard's clothing. This was strong confirmation that Green actually was an eyewitness to appellant's sexual assault of Gillard; how else would he have known?

In response, defense counsel sought in her argument to raise doubts about "when Mr. Green first said" the things that he told the government. Significantly, defense counsel did not dispute or question *what* Green had reportedly said in his meetings with the police and the prosecutor; in particular, counsel did not dispute that Green had predicted the result of the DNA testing, and she did not discuss that prediction. Counsel argued only that, without recordings or other records of the meetings, the jury had to take Green's uncorroborated word as to *when* he first said things to the government. In making that argument, counsel appeared to imply that the government deliberately made no record of the meetings in order to avoid revealing when Green said what he said. Counsel put the defense argument to the jury this way (emphasis added):

> [Green ha]s met with the U.S. Attorney's Office and the police numerous times. He met with them during his debriefing and then a bunch of times in January [2018] before this trial[,] and you're going to have to rely on Mr. Green telling you what is what about when he said what. . . . Detective Fulton told you that he was there for those. You have not seen a single note, video, audio or anything of all these meetings with Michael Green. I

mean, why not? *Why not make a record? Because they're going to tell you when he said things. . . .* I expect that the Government is going to argue that it's [a] compelling argument that before any reports were in, Mr. Green told them this stuff about what Mr. Valdez is supposed to have said.[81] Well, how do we know when Mr. Green first said this to them? How do we know it was in August[] 2016 and not in January? Because he says so and how does anybody know if they aren't recording it in all these meeting[s?]

The prosecutor objected at this point. Counsel approached the bench, where the prosecutor complained that "[defense counsel]'s calling us *Brady*[82] violators and she's saying how do we know that we're not." Defense counsel denied making that allegation ("I'm not saying law to anybody"), and the prosecutor then "just ask[ed] the [c]ourt to tell the jury that we have an obligation to turn this information over." Defense counsel did not oppose that request, the court agreed to it, and counsel returned to their respective seats. The court thereupon instructed the jury as follows: "Ladies and gentlemen, if there is any information that is given to the Government that is exculpatory to the Defendant, the prosecution has an obligation

---

[81] Here, defense counsel appears to have been referring to Green's trial testimony that appellant had told him he would claim he traded crack for sex with Gillard if his DNA were found in the semen samples on her clothing. But Green did not testify, and the government did not claim, that he reported this statement in his first debriefing or before the DNA test results were received.

[82] Referring to the government's obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose evidence that is materially favorable to the defendant in a criminal case, including evidence that would have impeachment value.

to turn it over, as it did in this case." There was no contemporaneous objection to this instruction.

Defense counsel then resumed and finished her argument focused on doubt as to *when* "these things were said" by Green:

> Okay. So, let's just say this. There's no evidence other than what comes out of Michael Green's mouth about when these things were said and whether people can remember exactly what dates.
>
> If there was some record of the date and what he said on what date, then you all could rest assured or not rest assured, but be a lot more convinced about how his story evolved because you know his story evolved.

Without further explaining how the particular dates might be significant, defense counsel then moved on to other topics before concluding her closing argument.

Although the point of the defense lack-of-corroboration argument was murky, it evidently was meant to cast doubt on whether Green actually told the government in his first debriefing that appellant's DNA would be found on Ms. Gillard's clothing, rather than at a later time. (There was no reason to think the date or occasion on which Green provided other information to the government was of any significance.) Yet defense counsel did not even mention Green's prediction. That Green in fact did *predict* the finding of appellant's DNA on Ms. Gillard's clothing at some point before Bode Cellmark Forensics reported the test results was never in

dispute. The government received Bode's report in April 2017, and according to the evidence, Green's only debriefing before then was the first one, which was in August 2016. But even if there was some uncertainty about precisely when Green first told the government what he knew Bode's DNA findings *would be*, it obviously must have been before Bode finally disclosed in April 2017 what its findings *were*. To posit otherwise would have made no sense, and appellant never made such a suggestion. Whatever the precise date, therefore, the fact remained that, notwithstanding the lack of any corroborative records of Green's debriefing, he made an accurate prediction that enhanced his credibility as an eyewitness to the murders. The defense lack-of-corroboration argument did not undercut this.

After the defense concluded its closing argument, the court adjourned for the evening. Before the government's rebuttal argument the next day, appellant moved for a mistrial. Citing *Greer v. United States*,[83] appellant contended that the defense had made a legitimate argument that a lack of corroboration bore on whether the government had met its burden of proof. Appellant denied that the defense had accused the government of withholding exculpatory evidence. In countering an accusation that had not been made, appellant argued, the court had improperly undermined his lack-of-corroboration argument, and undercut the standard of proof

---

[83] 697 A.2d 1207 (D.C. 1997).

beyond a reasonable doubt, by assuring the jury that the government had disclosed any exculpatory information in its possession. In lieu of a mistrial, appellant requested the court to instruct the jury that "the defense argument was proper and that the government always bears the burden of proof."

In response, the government argued that the defense argument went beyond fair comment on the lack of corroboration and amounted to an improper "missing evidence argument plus." This occurred, the prosecutor explained, when the defense claimed that the government did not record what Green said in his debriefings "because the Government knew that there would be some kind of inconsistency and then by not recording it we didn't have to turn it over." This claim, the prosecutor argued, was both false and unfairly misleading. False, because there in fact were records of Green's debriefings; as Detective Fulton had testified, the prosecutor *did* take notes during witness interviews, and it previously had been acknowledged in court outside the jury's presence that the government had disclosed "all of [Green's] inconsistent statements" to the defense. Unfairly misleading as well, because the defense implied that the government could have played recordings of Green's out-of-court statements to corroborate his testimony had they existed, "knowing full well" that the government could not do so under the rules of evidence.

The trial court declined to declare a mistrial or to retract its *Brady* instruction. The court stood by its determination that the defense closing argument "was made in a way that . . . at least suggested . . . that the Government . . . had exculpatory information that it was hiding." "That's exactly how I understood the argument," the judge added, and "in the context of a claim that somehow the Government is hiding the ball in terms of the information that they provided to the Defense," the judge deemed it "appropriate for the jury to know . . . that the Government had an obligation to turn things over and there's no reason to believe that they didn't." However, in an effort to alleviate the defense's concern, the court decided to reinstruct the jury on the government's burden of proof. (The court did so immediately following the government's rebuttal argument.)

In its rebuttal, the government briefly addressed the defense "allegation [that] we're hiding things from you." "[W]hen they say . . . wouldn't you want to hear those recorded statements if there were recorded statements in a debriefing," the prosecutor said, "ask yourselves can the Government just come in here and play all those recorded statements?" At this point, defense counsel voiced an unspecified objection (i.e., by saying the word "objection" without specifying any ground for it), which the court overruled. The prosecutor continued:

> If we could come in here and play recorded statements, wouldn't we just rely on the Grand Jury testimony? Why

> would we bring all of these witnesses before you? The point is there are rules and there is law and the Government is obligated to follow those things. So, don't just assume that because we have the burden of proof, we can introduce just anything into evidence.

At trial the defense did not pursue any objection to the foregoing statements by the prosecutor or request a curative instruction or other relief. On appeal, however, appellant argues that those statements exacerbated the trial court's allegedly improper undermining of the defense's comment on the lack of corroborative evidence by implying there actually was such corroboration of Green's debriefing statements that the government simply was not allowed to present at trial.

### 3. Discussion

As this court explained in *Greer*, "in assessing whether the government has met its burden of proving guilt beyond a reasonable doubt, the jury may properly consider not only the evidence presented but also the lack of any evidence that the government, in the particular circumstances of the case, might reasonably be expected to present."[84] Accordingly, "defense counsel may appropriately comment in closing argument on the failure of the government to present corroborative . . .

---

[84] 697 A.2d at 1210.

evidence."[85]   Simply put, defense counsel may "point out to the jury that no [corroborative] evidence has been introduced" and "argue that the absence of such evidence weakens the Government's case."[86]  "[A] reasonable doubt may arise . . . from a lack of evidence, after consideration of all the evidence."[87]

However, "[i]t is, of course, improper to argue or imply . . . that corroborative evidence, if obtained, would have been favorable to the defendant,"[88] let alone to suggest that the government's mere failure to present corroborative evidence indicates the government has suppressed available evidence favorable to the defendant.  A proper *Greer* argument is different from a missing evidence argument, in which "counsel asks the jury to infer that certain evidence, which exists and would elucidate the transaction, was not presented because it was unfavorable to the

---

[85] *Id.*; *see also, e.g.*, *Washington v. United States*, 965 A.2d 35, 44 n.29 (D.C. 2009) ("[T]he defense is always free to comment on the absence of evidence in arguing to the jury that the government has not met its burden to prove guilt beyond a reasonable doubt."  (alteration in original) (quoting *Wheeler v. United States*, 930 A.2d 232, 238 (D.C. 2007))).

[86] *Greer*, 697 A.2d at 1210 (quoting *United States v. Hoffman*, 964 F.2d 21, 26 (D.C. Cir. 1992)).

[87] *Id.* at 1211 (emphasis and internal quotation marks omitted) (quoting *Bishop v. United States*, 107 F.2d 297, 303 (D.C. Cir. 1939)).

[88] *Id.* (citing *Hoffman*, 964 F.2d at 24-25).

opposing party's case."[89]  So, for example, in *Hoffman*, where the police did not obtain fingerprints, the court held it permissible for the defendant to argue that the lack of fingerprint evidence weakened the government's case, but not (without laying a proper evidentiary foundation) to urge the jury to infer that fingerprint evidence would have been favorable to the defense, or "the existence of [other] facts *not* in the record."[90]  An argument suggesting that the police deliberately did not look for fingerprint evidence because they did not want to turn over evidence favorable to the defense would have been equally improper.  "It is elementary . . . that counsel may not premise arguments on evidence which has not been admitted."[91]

In this case, defense counsel went beyond pointing out the failure of the prosecution to introduce corroborative records of Green's debriefings as a weakness in the government's proof.  Counsel told the jury, "You have not seen a single note, video, audio or anything of all these meetings with Michael Green.  I mean, why not?  Why not make a record?  Because they're going to tell you when he said

---

[89] *Id.*  The requirements for making a proper missing evidence argument are more stringent than they are for a *Greer* argument.  *See generally Thomas v. United States*, 447 A.2d 52, 57-58 (D.C. 1982).  Appellant does not argue that the defense made or sought to make a proper missing evidence argument.

[90] 964 F.2d at 24-25 (emphasis in original).

[91] *Anthony v. United States*, 935 A.2d 275, 283 (D.C. 2007) (omission in original) (quoting *Johnson v. United States*, 347 F.2d 803, 805 (D.C. Cir. 1965)).

things." In those words, defense counsel invited the jury to infer that the government deliberately made no record of the debriefings in order to avoid revealing information that would have contradicted Green's testimony at trial regarding "when he said things." Even if it was not defense counsel's intent to convey that message, what she said was reasonably susceptible to being so understood. And that is how both the court and the prosecutor understood it. The suggestion that the jury could draw such an adverse inference from the missing evidence was not a proper *Greer* argument.

As it was reasonable to understand this argument as implicitly accusing the prosecution of withholding exculpatory evidence, a suitable curative instruction was appropriate. We are not persuaded that the court abused its discretion with the instruction it gave, that the prosecution had an obligation to turn over any exculpatory information and had done so. Defense counsel had confirmed as much, and the government's fulfillment of its *Brady* obligations was not in dispute. Contrary to appellant's contention, this instruction was consistent with (and did not contradict or impair) appellant's legitimate lack-of-corroboration argument, which defense counsel reiterated without objection (and without inviting the improper adverse inference) immediately after the court gave the instruction. A proper *Greer* argument is based not on the proposition that the missing corroborative evidence

would be exculpatory, but on the proposition that the presented evidence alone is insufficiently probative without corroboration.

As for appellant's objection to the rebuttal, the prosecutor was entitled to answer the implicit defense accusation that the government was hiding the truth by failing to introduce records confirming the dates on which Green said things in his debriefings. The court's *Brady* instruction left a lingering question as to why the government did not present records of Green's prior statements to bolster his trial testimony. In brief response, the prosecutor cautioned the jury against assuming, even "if there were recorded statements in a debriefing," that the rules of evidence would have permitted the government to introduce them at trial.[92] Appellant asserts

---

[92] *See, e.g.*, *Worthy v. United States*, 100 A.3d 1095, 1096-97 (D.C. 2014) ("As a general rule, prior consistent statements are not admissible to bolster the credibility of a witness."). Appellant argues that a recording of one particular statement by Green—that appellant's DNA would be found on Gillard's clothing— would have been admissible in evidence, as it would not have been offered for its truth, but only to show Green's knowledge. But defense counsel had not singled out this statement (or even mentioned it at all) in her argument, and the prosecutor was responding to a more general defense contention that the government had failed to present the jury with corroborative recordings of when Green said things in his debriefings.

We note that the government conceded at oral argument, and we agree, that it is not generally permissible for a prosecutor to refer to the rules of evidence or the possibility of excluded evidence or other information that "might or might not exist" in response to a valid burden of proof argument by the defense. Our holding that the trial court did not abuse its discretion in overruling the defense objection here is specific to the context in which that argument was made in this case.

on appeal that the government thereby impermissibly "argue[d] in rebuttal that there actually *was* a corroborating record of Green's debriefing." Appellant did not state this claim in the trial court, and it lacks merit. We disagree that the prosecutor made such an argument, either expressly or by implication; and we are not persuaded that the jury would have thought so or forgotten Detective Fulton's recent testimony—the only testimony on the point—that there were no video or audio recordings of the debriefings, only notes taken by the prosecutor. In her rebuttal, the prosecutor did not contradict Detective Fulton, and she said nothing about whether her notes corroborated Green. We hold that the trial court did not abuse its discretion in overruling appellant's non-specific objection to the prosecutor's rejoinder.

## E. The Sodomy and Felony Murder (Sodomy) Counts

Appellant was convicted of sodomy in violation of former D.C. Code § 22-3502(a) (repealed 1995) and three counts of felony murder predicated on his commission of three homicides in perpetrating that sodomy. Appellant contends his convictions on these four counts should be reversed because the District's sodomy statute was unconstitutional on its face under the Supreme Court's holding in *Lawrence v. Texas*.[93] The government argues that reversal is unwarranted because the sodomy statute was constitutionally applied to appellant's nonconsensual sexual

---

[93] 539 U.S. 558 (2003).

assault of Samantha Gillard. Appellant further contends that even if the sodomy statute was constitutionally applied in his case, he is entitled to reversal of his convictions for felony murder because the sodomy was over and done with before the murders were committed. The government disagrees, arguing that there was a sufficiently close causal connection between the sodomy and the murders to support the felony murder convictions.

For the following reasons, we agree with the government on each of these issues.

## 1. Constitutionality of the Sodomy Statute as Applied to Appellant

The District's former sodomy statute, which was repealed in 1995, made it a felony offense to engage in oral or anal sex, regardless of the circumstances. The statute criminalized not only sexual assaults and other predatory, nonconsensual acts,[94] but also private acts of sodomy between consenting adults.[95] In this respect,

---

[94] *See, e.g.*, *Gardner v. United States*, 698 A.2d 990, 991 (D.C. 1997) (sodomy convictions "resulting from a gang rape"); *Glascoe v. United States*, 514 A.2d 455, 458-59 (D.C. 1986) (defendant employed a gun, knife, and threats and forcibly committed oral sodomy on the victim).

[95] *See, e.g.*, *Greene v. United States*, 571 A.2d 218, 221 (D.C. 1990) (noting that the trial court properly "evaluated whether the acquittal of rape necessarily implied that the sodomy was consensual," for "[i]f it did, then presumably the sentence should be considerably lighter than for nonconsensual sodomy"); *United*

the sodomy statute was unconstitutionally overbroad, for as the Supreme Court held in *Lawrence* (eight years after the District's statute was repealed), the due process right to liberty protects private, noncommercial acts of sexual intimacy between consenting adults (including acts defined as sodomy) from government proscription.[96]

This was a limited holding. The *Lawrence* Court emphasized that the case before it did not involve minors or "persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused."[97] It is clear and undisputed that there is no constitutional right to engage in nonconsensual sodomy (or other predatory sexual conduct), and that the Constitution does not bar the criminalization of such conduct. *Lawrence* therefore did not render the District's sodomy statute unconstitutional in every application; the Supreme Court's decision means only that certain conduct (essentially, the private and noncommercial sexual behavior of consenting adults) is exempt from the sodomy statute's purview. Nonconsensual sodomy remains subject to prosecution.

---

*States v. Buck*, 342 A.2d 48, 48-49 (D.C. 1975) (citing cases rejecting the proposition that the sodomy statute "cannot constitutionally be applied to acts described therein when performed by mutually consenting adult males").

[96] 539 U.S. at 578.

[97] *Id.* The Court also noted that the case did not involve "public conduct or prostitution." *Id.*

In the present case, the grand jury indicted appellant specifically for nonconsensual sodomy; Count Seven charged that appellant, "while armed with a firearm, placed his penis in the mouth of Samantha Gillard, without the consent of Samantha Gillard." At the conclusion of appellant's trial, when the court submitted the case to the jury, the court likewise instructed the jury that the government had to prove that appellant committed the act of sodomy without Gillard's consent (and while armed with a firearm). Thus, appellant's sodomy conviction did not infringe his right to due process as recognized in *Lawrence*; appellant has not shown that the sodomy statute was unconstitutionally applied to him.

Appellant nonetheless argues that he was convicted under a statute that was facially unconstitutional, and hence a nullity, because it categorically banned acts of sodomy regardless of consent. As we have already said, we agree that the statute was overbroad on its face. But a facial challenge such as this typically requires the challenger to show that "the law is unconstitutional in all of its applications," and such a challenge "must fail where the statute has a plainly legitimate sweep."[98] "As a general rule, if there is no constitutional defect in the application of the statute to

---

[98] *Plummer v. United States*, 983 A.2d 323, 338 (D.C. 2009) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)).

a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations."[99]

In *Ayotte v. Planned Parenthood of Northern New England*, the Supreme Court addressed the question of remedy when a federal court confronts a state statute that "may be invalid as applied to one state of facts and yet valid as applied to another."[100] "Generally speaking," the Court said,

> when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact.[101]

Thus, the first principle is that "we try not to nullify more of a legislature's work than is necessary, for we know that 'a ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'"[102] "Accordingly, the 'normal rule' is that 'partial, rather than facial, invalidation is the required course,' such that

---

[99] *Cnty. Ct. of Ulster Cnty. v. Allen*, 442 U.S. 140, 154-55 (1979).

[100] 546 U.S. 320, 329 (2006) (quoting *Dahnke-Walker Milling Co. v. Bondurant*, 257 U.S. 282, 289 (1921)).

[101] *Id*. at 328-29 (citations omitted).

[102] *Id.* at 329 (brackets omitted) (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984) (plurality opinion)).

a 'statute may . . . be declared invalid to the extent that it reaches too far, but otherwise left intact.'"[103]

In pursuing that course, a court should take care not to overstep its role and usurp the prerogatives of the legislature by "rewrit[ing] [the] law to conform it to constitutional requirements."[104] If a statute "fails to require the government to prove everything the Constitution requires it to prove for a criminal sanction to be imposed, . . . and if the legislative design and the limits of the judicial function do not permit us to read the critical missing elements into the statute, then [the] appellant has carried his burden of showing that every application of [the statute] is unconstitutional—even if a validly written statute could have reached [the] appellant's particular conduct."[105] In *Tilley* and *Conley*, the limits of our judicial

---

[103] *Id.* (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)).

[104] *Id.* (first alteration in original) (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988)). Although, in construing a D.C. statute, this court may not be in quite the same position as a federal court would be, in that we may have somewhat more leeway to interpret a D.C. statute to avoid a constitutional problem, we view any difference as immaterial in this case. *See, e.g., Conley v. United States*, 79 A.3d 270, 289 (D.C. 2013) ("As this court has stated on more than one occasion, '[i]t is not within the judicial function . . . to rewrite the statute, or to supply omissions in it, in order to make it more fair.'" (alteration and omission in original) (quoting *In re Te.L.*, 844 A.2d 333, 339 (D.C. 2004))).

[105] *Conley*, 79 A.3d at 277; *accord Tilley v. United States*, 238 A.3d 961, 969-70 (D.C. 2020).

role did indeed preclude us from saving overbroad statutes by the simple expedient of limiting their scope, such as by reading in a missing element. In *Tilley*, we explained that we could not "undertake to rewrite the [Sexual Psychopath Act] in order to save it . . . [by] merely severing an unconstitutional provision and leaving the rest of the statute as it is," because "[s]aving the SPA would require changing it drastically by making difficult policy choices."[106] And in *Conley* this court was prepared to save the statute at issue if it could have done so merely by excising a provision that unconstitutionally shifted the burden of proof from the prosecution to the defense with respect to one element of the offense[107]; but as the court explained, the statute suffered from another constitutional flaw that judicial rewriting could not correct without "thwart[ing] the Council's intent" in enacting the statute.[108]

Ultimately, "the touchstone for any decision about remedy is legislative intent, for a court cannot 'use its remedial powers to circumvent the intent of the legislature.'"[109] Thus, "[a]fter finding an application or portion of a statute

---

[106] 238 A.3d at 978.

[107] 79 A.3d at 281.

[108] *Id.* at 289.

[109] *Ayotte*, 546 U.S. at 330 (quoting *Califano v. Westcott*, 443 U.S. 76, 94 (1979) (Powell, J., concurring in part and dissenting in part)).

unconstitutional, we must next ask: Would the legislature have preferred what is left of its statute to no statute at all?"[110]

We answer that question differently in this case than we did in *Conley* and *Tilley*. We adhere to *Ayotte*'s guidelines and follow the "normal rule" by holding that the sodomy statute is still validly applicable to nonconsensual conduct and other activity within its scope that is not constitutionally protected as set forth in *Lawrence*. That case is clear and the dividing line is not ambiguous. We do not "rewrite" the sodomy statute or trespass on the legislature's domain merely by recognizing that certain conduct between consenting adults to which the words of the statute would otherwise apply is constitutionally privileged and immune from prosecution. We have no doubt that the D.C. Council and Congress would prefer that we uphold application of the sodomy statute to conduct that always was (and still is) permissibly proscribed by it. Striking down the statute in its entirety and leaving such conduct possibly immune from prosecution (if the conduct was committed when the statute was in force) would unacceptably "thwart the

---

[110] *Id.*

[legislature's] intent."[111] Other jurisdictions have reached the same conclusion when confronted with constitutional challenges based on *Lawrence* to similar statutes.[112]

Accordingly, we reject appellant's constitutional challenge to the sodomy counts on which he was convicted.

## 2. Sufficiency of the Evidence Underlying Appellant's Convictions of Felony Murder Based on His Purposeful Killings in Perpetrating the Offense of Sodomy

The eighth, ninth, and tenth counts of appellant's indictment charged him with felony murder in violation of D.C. Code § 22-2401 (1981),[113] in that he killed Samantha Gillard, Curtis Pixley, and Keith Simmons "in perpetrating or attempting

---

[111] *Conley*, 79 A.3d at 289.

[112] *See, e.g.*, *Toghill v. Commonwealth*, 768 S.E.2d 674, 681 (Va. 2015) (holding that Virginia's sodomy statute "cannot criminalize private, noncommercial sodomy between consenting adults, but it can continue to regulate other forms of sodomy, such as sodomy involving children, forcible sodomy, prostitution involving sodomy and sodomy in public"); *State v. Whiteley*, 616 S.E.2d 576, 581 (N.C. Ct. App. 2005) (in light of *Lawrence*, "crime against nature" statute is unconstitutional in some applications but not "to prosecute . . . conduct involving non-consensual or coercive sexual acts," among other things); *Gilbert v. State*, 220 So. 3d 1099, 1105 & n.1 (Ala. Crim. App. 2016) (defendant lacks standing for facial challenge to "deviate sexual intercourse" statute because the charged offense was not "protected under *Lawrence*"; the statute had "many [legitimate] applications").

[113] Recodified as amended at D.C. Code § 22-2101.

to perpetrate" the crime of sodomy against Ms. Gillard. In *Lee v. United States*,[114] this court explained the "in perpetrating" requirement as follows:

> To prove felony murder, the government must establish "*some* causal connection between the homicide and the underlying felony." "Mere temporal and locational coincidence is not enough: it must appear that there was such actual legal relation between the killing and the crime . . . that the killing can be said to have occurred *as a part of the perpetration of the crime . . . .*" One way of meeting this requirement is to show that the underlying felony and the killing were "all part of one continuous chain of events."

Thus, on appeal, the question before us is whether "a reasonable jury could have found that the shootings were a means of facilitating the successful completion of the [sodomy], and that the [sodomy] and the killings were 'all part of one continuous chain of events.'"[115] In answering that question, "we view the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence."[116]

---

[114] 699 A.2d 373, 385 (D.C. 1997) (citations and brackets omitted).

[115] *Id.* at 386 (quoting *West v. United States*, 499 A.2d 860, 866 (D.C. 1985)).

[116] *Hooks v. United States*, 191 A.3d 1141, 1143 (D.C. 2018) (quoting *Offutt v. United States*, 157 A.3d 191, 193-94 (D.C. 2017)).

We conclude that the evidence sufficed to show that appellant's sexual assault on Gillard and the ensuing murders of Gillard, Pixley, and Simmons were "part of one continuous chain of events." Both the sexual assault and the murders arose from appellant's anger at what he perceived to be Pixley's attempt to steal crack cocaine from him. When Gillard unwittingly (and most tragically) appeared on the scene, appellant declared she would have to "do something" for the missing drugs and walked her a short distance away to a place where he then committed the assault. Appellant then walked her back to the others and invited Green to sexually assault Gillard as well. When Green declined, appellant had all three victims lie down on the ground next to each other and shot them all to death. The shootings occurred just moments after appellant had sodomized Gillard. Throughout the entire incident, appellant maintained continuous control over her, while his accomplice Green similarly maintained uninterrupted control over Pixley and Simmons. It was readily inferable, moreover, that appellant killed all three victims for the same basic reason, namely, to eliminate them as witnesses and thereby ensure the "successful completion" of the sodomy.[117] Clearly, the jury could "find a substantial causal

---

[117] That appellant may have had additional motives for the killings does not undermine the conclusion that the evidence showed a sufficient causal relationship linking the killings to the sodomy. *See Johnson v. United States*, 671 A.2d 428, 434 (D.C. 1995) ("In practically any felony murder case the defendant may have additional reasons to want to avoid capture for the just-committed felony.").

relationship between the felony [sodomy] and resultant homicide[s]"; this was not a case of "mere coincidence of space and time."[118]

Appellant argues that because "any sex acts were over before the shootings," the sodomy "could no longer be a predicate for felony murder." However, our case law does not support the proposition that a homicide committed in the immediate wake of a concluded felony cannot be charged as felony murder. We have held, for example, that "[w]hile [a] burglary . . . 'was a separate and distinct act from the killing' and was complete at the time of entry, it nevertheless 'may be deemed to be a continuing offense for purposes of the felony-murder statute.'"[119] More recently, this court noted that in general, "for purposes of felony murder, [the predicate] felony is deemed to be still in progress if [the] defendant has not left [the] scene or if [the] defendant is fleeing [the] scene" at the time of the homicide.[120]

---

[118] *Id.* at 435.

[119] *Lee*, 699 A.2d at 385-86 (quoting *Marshall v. United States*, 623 A.2d 551, 558 (D.C. 1992)).

[120] *In re D.N.*, 65 A.3d 88, 94 (D.C. 2013) (citing Charles E. Torcia, 2 *Wharton's Criminal Law* § 150 (15th ed. 1994)). The current edition of *Wharton's Criminal Law* also states that "for the purpose of felony-murder, a rape or [other felony] is deemed to be in progress after the felony proper when defendant is still on the scene or when defendant is fleeing from the scene." Jens David Ohlin, 2 *Wharton's Criminal Law* § 21:14 (footnotes omitted) (16th ed. 2021); *see also* Wayne R. LaFave, 2 *Substantive Criminal Law* § 14.5(f)(1) (3rd ed. 2018); *id.* § 14.5(f)(2) ("In short, whether there is a sufficient causal connection between the

Accordingly, we hold that the evidence at trial was sufficient to prove the causal connection between the sodomy and the murders necessary for convictions of felony murder.

**III.**

For the foregoing reasons, we affirm appellant's convictions and the judgment of the Superior Court. As some of the counts of conviction are subject to merger,

---

felony and the homicide depends on whether the defendant's felony dictated his conduct which led to the homicide. If it did, and the matters of time and place are not too remote, the homicide may be 'in the commission of' the felony; but if it did not, it may not be.").

For examples of cases upholding felony murder convictions for homicides committed following sexual assaults, under statutes requiring the murder to have been committed "in the commission" or "in the perpetration" of the underlying felony, *see Commonwealth v. Witkowski*, 169 N.E.3d 496, 503 (Mass. 2021) ("To support a conviction of felony-murder in the first degree, the killing need not have occurred during the course of the predicate felony itself, but only as part of one continuous transaction, a standard which is met if the two took place at substantially the same time and place. . . . Where rape is the predicate felony, it is not necessary that the homicide occur while the rape is in progress nor that it be caused by the rape." (internal quotation marks and citations omitted)); *People v. Thompson*, 785 P.2d 857, 877-78 (Cal. 1990) (stating that the "only nexus required is that the felony and the killing be part of a continuous transaction," a condition that was satisfied where the victim remained under the defendant's control for some two hours after the felonious sexual act was committed before the defendant killed him).

we remand the case for the trial court to address that remaining issue and vacate counts that merge.[121]

*So ordered.*

---

[121] *See, e.g., Hairston v. United States*, 264 A.3d 642, 652-53 (D.C. 2021).